2002 WY 18

Jessica GARNICK, Appellant (Plaintiff),

v.

TETON COUNTY SCHOOL DISTRICT NO. 1, a.k.a. Teton County School District Number One, Appellee (Defendant).

Teton County School District No. 1 a.k.a Teton County School District Number One, Appellant (Defendant),

v.

Jessica Garnick, Appellee (Plaintiff).

Nos. 00–213, 00–214.

Supreme Court of Wyoming.

Feb. 6, 2002.

Robert N. Williams of Meyer and Williams, Jackson, Wyoming, Representing Jessica Garnick. Argument by Mr. Williams.

Tracy J. Copenhaver of Copenhaver, Kath & Kitchen, LLC, Powell, Wyoming, Representing Teton County School District No. 1. Argument by Mr. Copenhaver.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

HILL, Justice.

[¶ 1] Jessica Garnick (Garnick) was injured while maneuvering through an obstacle course as part of a personal fitness class at Jackson High School. Garnick is Appellant in Case No. 00–213, and Teton County School District No. 1 (the School) is the Appellee. Although the jury's verdict was generally in her favor, Garnick contends that the district court committed several errors during the trial of her negligence claim, against the School, that require the matter to be reversed and remanded to the district court for a new trial. In Case No. 00–214 the School is the Appellant and Garnick the Appellee. The School contends that the trial court erred in its award of costs to Garnick, and Garnick concedes that the award of costs should be modified in some respects. We will affirm in Case No. 00–213, and we will modify, but otherwise affirm, the award of costs at issue in Case No. 00–214.

## ISSUES

[¶ 2] In Case No. 00–213, Garnick raises these issues:

A. Was reversible error committed when the jury, during an onsite inspection, of the site of the injury, conducted an independent investigation of the mishap?

B. Did the trial court commit reversible error in permitting evidence of a collateral source over plaintiff's objection?

C. Did the trial court commit reversible error when it failed to excuse juror Shidner for cause, when she admitted a bias in favor of the defendant, thereby forcing plaintiff to waste a peremptory challenge?

D. Did the jury's expression of confusion at the time of the rendition of the verdict demonstrate that it didn't understand the instructions of the Court?

E. Did the trial court commit reversible error when the procedures established to accept a verdict and permit polling of a jury by W.S. § 1–11–212 through W.S. § 1–11–214 were disregarded?

F. Was the trial court's refusal to instruct the jury, as plaintiff requested, reversible error, and should the trial court have granted a new trial?

The School rephrases those issues thus:

A. Was it reversible error for a juror in the presence of the Court and counsel, to

take a measurement during an on-site inspection, which measurement was not objected to and was subsequently placed on the record with counsel being given an opportunity to inquire and without any objection?

B. Is it reversible error for the trial court to permit testimony relating to the availability of services to an injured party and the cost thereof?

C. Did the trial court commit reversible error when it refused to excuse juror Shidner for cause when she specifically expressed an ability to be fair and impartial?

D. Did the Court properly and fairly address the concerns of the jury at the time of rendering a verdict by allowing them to return to the jury room for further deliberations after a clear explanation of the effect of their verdict was given to them?

E. Did the trial court commit reversible error when it allowed counsel for Appellant to poll the jury after rendering its initial verdict and then, after clear explanation was given to the jury, accepting the revised verdict without requiring the jury to be re-polled when counsel failed to object or request that the jury be re-polled?

F. Was the trial court's refusal to instruct the jury, as Appellant requested, reversible error and should the trial court have granted a new trial?

[¶ 3] In case No. 00–214, the School raises these issues:

I. Whether the district court erred in awarding plaintiff costs for plaintiff's expert in excess of those costs allowed by the Uniform Rules for District Courts?

II. Whether the district court erred in awarding plaintiff costs for unnecessary depositions?

III. Whether the district court erred in awarding plaintiff costs for additional deposition transcript excerpts?

IV. Whether the district court erred in awarding plaintiff costs for witness fees in excess of those allowed by the rules?

[¶ 4] Garnick does not provide a statement of the issues for this portion of the appeal but concedes that some of the items awarded as costs should be modified, although the bulk of them should be affirmed.

## FACTS

[¶ 5] Garnick was injured in a physical education class at Jackson High School on October 30, 1997. At that time, she was 17 years old. Garnick was an accomplished singer, dancer, and actress,[1] and before the accident had completed an application to attend the Cincinnati Conservatory of Music.[2] While completing her final exam for the physical fitness class, Garnick was required to jump from a balcony, a distance of 13 feet, to a pole vault mat that was 5' wide, 11' long, and 2' thick.[3] Garnick missed the mat and landed on the gymnasium floor. She suffered numerous injuries, which included shattering each of her ankles. Both will require fusions, which will take away movement in her ankles. The injuries have required considerable medical attention and expense and will continue to do so for some time to come. Of perhaps greater importance, as a result of her injuries, Garnick will not be able to pursue her intended career to any meaningful extent.[4] Although the jury never became

---

1. Garnick's family operated a dude ranch and summer theater in Jackson. She starred or otherwise appeared in many theater productions. Her life had been built around the theater, which she planned to pursue as a career. There was evidence to the effect that musical theater requires three distinct talents: to sing well, dance well, and act well. As a result of her injuries, Garnick lost one of the three requirements, and a second was seriously impaired, *i.e.*, she could no longer dance, and her ability to move gracefully on stage is hampered by a permanent limp.

2. There is evidence in the record that assesses the Cincinnati Conservatory as one of the institutions that attracts those looking for talent for Broadway musicals.

3. Thus, the distance from the railing to the floor was 13', but the distance from the railing to the mat was 11'. The evidence also showed that over a period of 16 years, 10,000 students had done the obstacle course, and Garnick was the only person to have missed the mat.

4. The School presented evidence that the "average" musical theater performer earns only about $13,000.00 per year, whereas, as a music education teacher, Garnick could earn over

aware of it, the School had, in effect, waived its governmental immunity to the extent of $1,000,000.00 by obtaining liability insurance in that amount.

## CASE NO. 00-213

### DISCUSSION

#### The Jury's Visit to the Scene of the Accident

 [¶ 6] The applicable standard of review is this. The issue comes to this Court upon appeal of the district court's denial of a motion for new trial. Trial courts have broad discretion when ruling on a motion for new trial, and they will not be reversed absent an abuse of that discretion. A party seeking reversal has a heavy burden; indeed, the party must show that a different result would have been obtained absent the abuse. *Carlson v. Carlson,* 888 P.2d 210, 215 (Wyo. 1995).

[¶ 7] Garnick acknowledges that she requested the jury visit to the scene of the accident. If there were objections to the request, the School does not make reference to them. The good judgment of the trial court in granting the motion for a jury view is not called into question by the parties and, in that regard, we only suggest that a trial court may wish to make a clearer record as to the value of such a view than was done in this case. *See* 75 Am.Jur.2d *Trial* §§ 258–60 and 271(checklist for jury view) (1991).[5] Again, the record does not reflect these facts, but it appears to be accepted as true by both parties that the visit included the jury, the parties, counsel for both parties, the trial

judge, and the court reporter. The record does not reflect that the jury or the bailiff(s) were instructed about any guidelines or limitations with respect to the accident scene visit.[6] Wyo. Stat. Ann. § 1–11–206 (Lexis-Nexis 2001) provides this bit of guidance for a trial court:

> When the court considers it proper for the jurors to view the property which is the subject of litigation or the place in which any material fact occurred, it may order them to be conducted in a body under the charge of an officer to the place which shall be shown to them by a person appointed by the court for that purpose. While the jurors are absent no person other than the person so appointed shall speak to them on any subject connected with the trial.

[¶ 8] This brief passage in the record sets the stage for the visit:

> THE COURT: ...
>
> And I want the record to reflect that we are going out to the school at this time. It's a quarter to 10:00. We will embark at about five minutes to 10:00. Counsel is permitted to go. Jessica is permitted to be there. Mrs. Weaver is permitted to be there as the representative of the School that's sitting at counsel table. But we, meaning the Jury, the Bailiff, Patricia and I are not going to wait around for you folks. If you are there, you can participate. But if you're not there, we're just going to go ahead and look at the gymnasium.

[¶ 9] The transcript shows this with respect to the proceedings at the gymnasium:

---

$30,000.00 a year. At the time of trial, Garnick was attending college with a goal of obtaining a degree in music education. There was evidence that Garnick was considerably more than average and that she had the talent, charisma, and competitive drive to succeed in musical theater.

5. As a general rule, a trial court would decline to allow a jury view where conditions are changed in some material way. 75 Am.Jur.2d *Trial* § 260 (1991). In this instance, it is difficult to determine whether the changes in the accident scene were "material." The gymnasium was apparently the same, but it became obvious (in hindsight) that it did not look, and was not set up, as it was on the date of Garnick's injuries.

6. Where a view by a jury is had, the jurors should be instructed as to the purpose and effect of the visit. The failure to give such instructions may be without prejudice. "The jury may be instructed that after having made an inspection of the premises, it is not bound to accept as true any testimony which it believes to be untrue after a personal inspection of the matter testified about, or it may be instructed to return a verdict according to testimony if it is in conflict with what its personal inspection has disclosed." 75B Am.Jur.2d *Trial* § 1234 (1992). Of particular importance will be instructions to the jury with regard to whether the view is "evidence." 75 Am.Jur.2d *Trial* § 264 (1991).

JUROR [E.]: Could we see the balance beam, where it was?

THE COURT: Is there a person from the school here? They want to see the balance beam.

Oh, there is Mrs. Weaver. Can you put the balance beam up?

MR. COPENHAVER: Judge, its going to take some time. It's out in the sporting shed. She can show them where it was, but that's about it.

THE COURT: Come show them where it was, Mrs. Weaver. (Mrs. Weaver indicated where the balance beam was placed.)

MRS. WEAVER: you could craw[l] through the obstacle and the balance beam starts right about here and goes to about right about here.

MR. MEYER: Where does it stop?

MRS. WEAVER: Right back to here.

THE COURT: Okay. Mr. Colter, round them up. Let's go back.

[¶ 10] The record contains a reporter's note that several inaudible comments were made by jurors to one another during the visit. We learn more about the visit, after the fact, when the trial court was compelled to deal with a predictable "glitch" that occurred during the accident scene visit:

THE COURT: Ladies and Gentlemen, I have to make a record of at least one thing out there at the gymnasium. Some of you produced a tape and measured the distance from the top rail of the mezzanine down to the mat. What was the distance that you measured? I want—it has to be part of the record.

JUROR [O.]: The tape is twelve feet.

THE COURT: How much was it?

JUROR [O.]: The tape was twelve feet [7].

THE COURT: Twelve feet.

JUROR [O.]: And it was just a little bit more.

MR. MEYER: Was that from the top of the mat or from the floor?

JUROR [O.]: No, from the floor.

MR. MEYER: From the floor to the rail?

THE COURT: Any other measurements that you took?

JUROR [O.]: Nope.

JUROR [E.]: That's not true. We kind of measured from the end of the beam to the tape. We didn't have a tape measure, but the tiles are a foot by a foot.

THE COURT: So what was—so what was the distance?

JUROR [E.]: Eight feet, from the tape next to the wall.

MR. MEYER: Can I ask, your Honor, how they determined where the—where the beam ended though?

THE COURT: Mrs. Weaver showed us—showed the spot where the beam was placed and you Jurors, apparently, made a measurement from that point to the middle of the—the tape. Is that how it was Mrs. [E.]?

JUROR [E.]: To the tape closest to the wall.

MR. MEYER: Okay. Was there a measurement made to the first tape?

JUROR [E.]: Well, we knew that it was three feet between the tape—

MR. MEYER: Okay.

JUROR [E.]:—is what we surmised from that.

MR. MEYER: Okay.

THE COURT: Anything else that the jury did out there that needs to be made part of the record?

Because, you see, what you're doing is evidence, folks. You are doing your own evidence gathering when you start measuring stuff. And I need to make sure that all the evidence is reflected in the record. That's why I have to talk to you about it.

Yes, Mrs. [S.]?

JUROR [S.]: I didn't measure anything, but I don't know if this matters. I did feel the thickness of the orange mat that was affixed to the bleachers.

THE COURT: I think everyone did that. (Pause.)

7. In context, it seems clear that the juror was using a tape measure that was 12′ in length, and that the measurement was 12′ plus "a little bit more." Thus, the difference between Garnick's expert's measurements and that of the jury is a matter of inches.

All right. Call your next witness, counsel, please.

[¶ 11] Garnick contends that the trial court erred in denying her motion for new trial, which was filed after the relatively unfavorable verdict was received by the trial court. Garnick's counsel does not contend that any other remedial request was made at the time, for example, for a remedial instruction or for a mistrial.[8] Counsel for Garnick goes on to recite authority relating to unauthorized accident scene visits or unauthorized experiments by the jury. This, of course, was not an unauthorized[9] view, but Garnick does assert that the jury engaged in "unauthorized" conduct during an authorized visit.[10] As set out above, Garnick was aware of what occurred and did not seek either remedial instructions or to have a mistrial declared. As a general rule, that failure constitutes a bar to any subsequent assertion of the error. 75B Am.Jur.2d *Trial* § 1725 (1992); *also see* 75B Am.Jur.2d *Trial* §§ 1548–1555 (1992). In particular, we note the text of § 1554:

> Where it is disclosed prior to the verdict that jurors have engaged in an unauthorized view, a prompt objection is required or the losing party will be held to have "speculated" on a verdict in his favor and will be barred from complaining. The error arising from an unauthorized view by a juror of a scene pertinent to the trial of the cause in which the juror is sitting must be properly assigned, presented, and preserved for appeal.

*Also see, DeWitty v. Decker,* 383 P.2d 734, 736 (Wyo.1963). Garnick refers to an affidavit from a juror to help advance a contention that the jury used the measurements taken by individual jurors at the view to devaluate the credibility of Garnick's case as well as her expert witnesses whose opinions relied on the distance from railing to floor being 13 feet. The district court did not consider the affidavit, and we approve of that decision. Garnick's brief does not contain cogent argument or pertinent authority that would convince us that the trial court abused its discretion in not giving weight to that affidavit. The affidavit is inconclusive as to the effect the measurement had on that individual juror's views and is speculation as to all other members of the jury. *See* 75B Am.Jur.2d *Trial* § 1555.

[¶ 12] We conclude, given the totality of the circumstances of this case, and particularly in light of Garnick's failure to suggest or seek timely remedial measures, that the district court did not abuse its discretion in denying the motion for new trial.

## Error in Admission of Evidence of an Improper Collateral Source

[¶ 13] The admission of evidence is within the sound discretion of the trial

---

8. The district court's findings in this regard are found in its decision letter denying Garnick's motion for a new trial, or for an additur:

 Third, when parties insist upon the jury visiting the accident scene, they accept the risks inherent in such an endeavor. Among the risks is the inability to predict or guard against what 12 strong-willed people might do during their site visit. In this case, the jury decided to feel the pole vault mat and to measure the height of the mezzanine.

 Because the jury did their own measurements, the Court made their activities and findings part of the evidence and record. The Court gave the parties an opportunity to deal with the actions of the jury, as they deemed appropriate.

 No request for remedial actions were [*sic*] made by either party and no objections were raised. Therefore, the objections, if any, to the jury's activities were waived.

 If either the jury or the Court committed error, under the plain error doctrine, the errors are harmless. The measurements made by the jury did not differ significantly from the measurements made by the Plaintiffs.

9. An unauthorized view occurs when a juror or jurors goes to the scene without benefit of court supervision. See 75B Am.Jur.2d *Trial* §§ 1548–55 (1992).

10. "Just as it is improper for them to do so at other times, the jury may not make experiments, demonstrations, or tests during an authorized view. Where the test, experiment, or demonstration relates to matters not in dispute or which are immaterial, however, the conduct of the jury, although susceptible of criticism, is to be considered not prejudicial."

 "A party will be deemed to have waived objection to misconduct of this kind by failing to raise proper objection or to otherwise bring the matter to the attention of the court at the trial when he or his counsel has knowledge of such misconduct and the opportunity to raise objection thereto." 75 Am.Jur.2d *Trial* § 269 (1991).

court, and we will not disturb evidentiary rulings unless the appellant demonstrates a clear abuse of discretion. *Young v. HAC, LLC,* 2001 WY 50, ¶ 6, 24 P.3d 1142, ¶ 6 (Wyo.2001). The core of our inquiry must reach the question of the reasonableness of the choice made by the trial court. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria. It means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. We must ask ourselves whether the district court could reasonably conclude as it did and whether any facet of its ruling was arbitrary or capricious. *Carlton v. Carlton,* 997 P.2d 1028, 1031 (Wyo.2000); *Young,* ¶ 6.

[¶ 14] In the presentation of this issue, Garnick relies on the case of *Banks v. Crowner,* 694 P.2d 101, 105 (Wyo.1985), wherein we adopted the collateral source rule:

> We will now consider whether the hospital bills from the Veteran's Administration (V.A.) were properly submitted to the jury for consideration. It is generally held that one who is injured by the tortious conduct of another is entitled to recover the reasonable value of the medical services necessary to treat the injury. This is true even if the medical services are rendered gratuitously:
>
>> "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable. Restatement (Second), Torts 2d, § 920(A)(2) (1982).
>
> Comment (c) of the above section reads, in relevant part:
>
>> "c. The rule that collateral benefits are not subtracted from the plaintiff's recovery applies to the following types of benefits:
>>
>> * * * * * *
>>
>> "(3) Gratuities. This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services or the plaintiff

> was treated in a veterans hospital does not prevent his recovery for the reasonable value of the services."

See also, *Hudson v. Lazarus,* 95 [U.S.]App.D.C. 16, 217 F.2d 344 (1954), where a veteran was treated in a veteran's hospital after he sustained injuries in a car accident, the court allowing the recovery of such medical and hospital expenses rendered, even though they were received gratuitously. It is noted in the present case that appellee agreed to reimburse the V.A. for all medical services rendered; however, that matter is between appellee and the V.A. and is immaterial to our decision in this case.

[¶ 15] Garnick's objection to the admission of evidence based on the collateral source rule arose in this context. The School's expert witness, Patrick Renfro, was testifying as a witness designed to rebut Garnick's damages. Renfro is a registered nurse and rehabilitation specialist. Renfro testified on many subjects, but when it came to the subject of rehabilitation counseling, the following occurred:

> Q. How about with regard to rehab counseling? I mean, just with a rehab specialist?
>
> A. Well, again, that's something that I do a great deal of. And as I discussed this with Jessica and her mom during our interview, I would anticipate that given the fact that her injury has affected some of her goals and plans for the future, she might benefit from being able to consult with a rehabilitation professional, vocational professional and that there are a variety of ways that she can take advantage of that, one of which we mentioned earlier, the high school counselor. The college that she attends has—she'll have an academic counselor. She'll also have a placement counselor. The schools also have available a disabled student's counselor who is available to provide assistance and counseling specifically to an individual with a disability. Each state, also, has a Division of Vocational Rehabilitation.

MR. MEYER: Your Honor, I do have an objection based upon the collateral source rule.

MR. COPENHAVER: I don't think those services fall under that, your honor. (Pause.)

THE COURT: Mr. Meyer, I'm sitting up here contemplating that because I guess I don't know whether or not the Plaintiff is claiming a loss because of—an expense that you and I don't have in our lives for rehabilitation counseling.

MR. MEYER: We're not saying anything about that. It's going to be up to the jury to decide that based upon what they know of Jessica, but we put no testimony in at all that this expense—that there will be an expense for this.

MR. COPENHAVER: Well,—

THE COURT: Then I do not understand your collateral source objection.

MR. MEYER: Well, I think the testimony falls within the collateral source and I have a legal responsibility to raise the objection.

THE COURT: Well, it's overruled then.

Q. Do you remember where you were?

A. Yes, I just mentioned the Division of Vocation Rehabilitation which is a program an individual has to qualify for and which would provide rehabilitation counseling. It could provide assistance with even equipment or training expenses, if the person needed those services from a financial standpoint. But those are two examples of the types of services from a rehabilitation counseling standpoint that are available to Jessica and which would be of assistance to her in making decisions, figuring out what kinds of accommodations would be appropriate to allow her to be as functional as possible in her chosen vocational pursuits.

Q. And are those available at no cost?

A. Yes, sir.

██ [¶ 16] The only objection broached by counsel for Garnick was the collateral source rule. However, Garnick had received no gratuitous services of the nature discussed in the testimony solicited from Renfro, nor was she making any claims for damages in that regard, and, therefore, the district court overruled the objection. For the sake of clarity, it is worth mentioning that the testimony appears to have had no relevance whatsoever, and it is apparent that some of it may have been quite inaccurate. Of course, at the time of trial, Garnick was no longer in high school, so she could not very well have gone back to her high school alma mater to seek services. There is nothing in the record to suggest that Garnick was "disabled," or that she needed vocational rehabilitation, or that she could have qualified for those services if she did need them. As a matter of fact, there is nothing in the testimony introduced in Garnick's behalf that she needed any of the services discussed in the above-quoted portion of Renfro's testimony. It is, however, clear from the tenor of the testimony that it was intended to convey to the jury that it should not award any money to Garnick for such services as those enumerated in the above-quoted testimony because she could get them for free, or in the event that she might need them in the future they would be free. To that extent, the collateral source rule is relevant, and it would have been prudent for the district court to have sustained the objection. The objection was in the "ballpark" but, more importantly, it was readily apparent that the testimony was otherwise irrelevant and, thus, inadmissible. However, we do not see this oversight on the part of the trial court as constituting reversible error. It is de minimus and, if error at all, harmless. W.R.C.P. 61.[11]

## Failure of Trial Court to Strike a Juror for Cause

██ [¶ 17] Garnick contends that the district court committed reversible error in de-

---

11. W.R.C.P. 61 states:
"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

nying her request to challenge a juror for cause.[12] The basis for the challenge lay in a potential bias of the juror in favor of the School and its chief witnesses. We apply an abuse of discretion standard to a trial court's ruling on a challenge for cause. *Krahn v. Pierce*, 485 P.2d 1021, 1024 (Wyo.1971). In connection with the review standard, Garnick does point out a recent decision of this Court wherein we opined, in the form of dicta, that district judges should be wary of rehabilitating a prospective juror who has vehemently articulated bias or prejudice with respect to a party or issue. *Ormsby v. Dana Kepner Company of Wyoming, Inc.*, 997 P.2d 465, 472 (Wyo.2000). While that remains sound advice, it does not alter the applicable standard of review or Garnick's burden of persuasion with respect to this issue. More importantly, nothing resembling a "vehemently articulated bias or prejudice with respect to a party or issue" can be found in this record.

[¶ 18] Garnick contends that because this juror was a "friend" of Mr. Holzer, who was the gym teacher who designed the obstacle course on which Garnick injured herself, the trial court should have granted a challenge for cause. The record shows that the juror indicated she knew Holzer because he had coached her children, both children had done the obstacle course as a part of their schooling, and because she had taken some "ropes" courses that Holzer taught. She did consider Holzer to be a friend. Her children knew Garnick, and one of them talked to Garnick about the accident wherein Garnick was injured. After these facts were revealed by the juror, she was asked if her relationship with Holzer would cause her problems in serving as a juror, to which she answered "No." When asked if she could give Garnick a "fair shake," she answered "Yes." In several follow-up questions, the juror continued to indicate she could be fair. Garnick includes in this challenge the fact that the juror also knew the high school principal, but the juror likewise indicated that would create no problems in her jury service. Later in the voir dire, it was revealed that one of the juror's sons served as a teaching assistant for Mr. Holzer. Counsel for Garnick again asked if that would make it difficult for her to serve as a juror, and she indicated that it "could be," and that it might be "awkward" for her. Based upon those responses, counsel asked that the juror be excused. The trial court then asked if she could be fair to both sides, and the juror responded, "I guess I still feel that I could listen to both sides and judge fairly." The trial court indicated that that was "fair enough for me," and denied the request. Counsel then asked another series of questions and concluded that series by asking the juror if, "as you sit here on this jury, could you give Jessica Garnick the same consideration you would give Mr. Holzer?" The juror answered, "Yes." On two more occasions, counsel for Garnick renewed his objections to the seating of this juror and, although the trial court expressed some misgivings about the juror, he did not alter his initial ruling.

[¶ 19] We are unable to characterize these circumstances as an abuse of discretion, and Garnick has cited no pertinent authority that would dissuade us from this conclusion. We note briefly that Garnick goes

---

12. Wyo. Stat. Ann. § 1–11–203 (LexisNexis 2001) (emphasis added) states:

§ 1–11–203. **Challenges for cause; grounds.**
(a) Challenges for cause may be taken on one (1) or more of the following grounds:
(i) A lack of any of the qualifications prescribed by statute which render a person competent as a juror;
(ii) Relationship by consanguinity or affinity within the third degree to either party;
(iii) Standing in the relation of debtor or creditor, guardian or ward, master or servant, or principal or agent to either party, or being a partner united in business with either party, or being security on any bond or obligation for either party;

(iv) Having served as a juror or a witness in a previous trial between the same parties for the same cause of action, or being then a witness therein;
(v) Interest on the part of the juror in the event or question involved in the action, but not an interest of the juror as a member or citizen of a municipal corporation;
(vi) Having formed or expressed an unqualified opinion or belief as to the merits or the main question of the action. The reading of newspaper accounts of the subject matter before the court shall not disqualify the juror either for bias or opinion;
(vii) **The existence of a state of mind in the juror evincing enmity or bias for either party.**

to some length to describe the juror upon whom they would have exercised a peremptory challenge had they not found it necessary to use it on the juror more fully described above. We need not further elaborate on that matter because we find no error in the trial court's denial of the challenge for cause.

### Juror Confusion Requires a New Trial as Does Failure to Further Poll Jury

[¶ 20] The standard of review is that set out above with respect to a trial court's ruling on a motion for new trial. In this regard, we also note that the verdict form used by the trial court was that proposed by Garnick, and that Garnick made no objections to the use of the verdict form.

[¶ 21] It is evident that this jury did have some trouble with the rendition of its verdict. We set out the verdict form exactly as the jury filled it in, in order to make clear the genesis of this issue:

### VERDICT FORM AND INTERROGATORIES

We, the jury, duly impaneled and sworn in this case, do unanimously find as follows:

1a. Do you find, by a preponderance of the evidence, that defendant TETON COUNTY SCHOOL DISTRICT NO. 1 was negligent?

Yes ___x___

No _____

**If your answer above is "yes" move to question 1b.**

**If your answer above is "no" sign the verdict form and give it to the bailiff.**

1b. Do you find, by a preponderance of the evidence, that such negligence was a cause of the injuries to plaintiff, JESSICA GARNICK.

Yes ___x___

No _____

**If your answer above is "yes" move to question 2a.**

**If your answer above is "no" sign the verdict form and give it to the bailiff.**

2a. Do you find, by a preponderance of the evidence, that plaintiff JESSICA GARNICK was negligent?

Yes ___x___

No _____

**If your answer above is "yes" move to question 2b.**

**If your answer above is "no" move to question 4.**

2b. Do you find, by a preponderance of the evidence, that such negligence was a cause of the injuries to plaintiff, JESSICA GARNICK.

Yes ___x___

No _____

**If your answer above is "yes" move to question 3.**

**If your answer above is "no" move to question 4.**

3. Considering all of the fault at 100%, what percentage of the total fault is attributable to each of the following for the negligence claims only?

| | |
|---|---|
| A. Defendant School District (0% to 100%) | 50% |
| B. Plaintiff Jessica Garnick (0% to 100%) | 50% |
| Total | 100% |

(the total must equal 100%)

**If you find that Jessica Garnick's fault is greater than 50%, sign the verdict and return it to the baileff [*sic*]. If you find that Jessica Garnick's fault is less than or equal to 50%, Please go on to question 4.**

4. Without considering the percentage of fault attributed as above, what total amount of damages do you find was sustained by Plaintiff Jessica Garnick (Note, the Judge will make appropriate deductions for fault attributable to the plaintiff, Jessica Garnick, if any)

250,000.00
$ ~~150,000.00~~

[¶ 22] The verdict form was, of course, dated and signed by the foreperson of the jury. The second to the last instruction given to the jury (Instruction No. 20) was as follows:

This case must be determined on the basis of comparative fault. In deciding the case you will need to know the meaning of the terms "negligence" and "fault."

When the word negligence is used in these instructions, it means the failure to use ordinary care. Ordinary care means the degree of care which might reasonably be expected of the ordinary careful person under the same or similar circumstances. The law does not say how such an ordinary careful person would act. That is for you to decide.

A person is at fault when that person is negligent and that person's negligence is a cause of the injury or damages for which the claim is made.

It will be necessary for you to determine the percentage of fault, if any, of each of the persons involved in the occurrence. It also will be necessary for you to determine the amount of damages sustained by any party claiming damages.

Your findings as to fault will affect the plaintiff's recovery. It is my duty to explain how that may occur.

The defendant's liability for damages is limited by the percentage of fault, if any, that you find is attributable to the defendant.

The recovery for the plaintiff is reduced by the percentage of fault, if any, that you find attributable to the plaintiff, Jessica Garnick.

Should you determine that plaintiff, Jessica Garnick's, fault exceeds fifty percent, the plaintiff will not be entitled to recover any damages.

In explaining the consequences of your verdict, the court has not meant to imply that any person is at fault. That is for you to decide in conformity with these instructions.

[¶ 23] The case was submitted to the jury, and the jury retired for its deliberations at 2:03 p.m. on November 9, 1999. The jury deliberated until late into the night. At 11:47 p.m. that same day, the trial court called the jury into the courtroom, apparently believing that the jury may have been unable to reach a verdict. The jury indicated that it was not having trouble reaching a verdict, and the trial court sent the jury back to the jury room to continue its deliberations at 11:53 p.m. The jury then returned to the courtroom at 12:12 a.m. on November 10, 1999, with a verdict. The verdict was read and, as shown above, the jury initially awarded Garnick $150,000.00 in damages. The jury was polled, and each juror acknowledged the verdict. The trial court then asked counsel if the jury should be polled further. Counsel for Garnick asked the trial court to ask the jury if its intended verdict was that Garnick receive only $75,000.00 in damages. This exchange then occurred in the courtroom:

THE COURT: The result of your verdict, Ladies and Gentlemen, will be that Jessica Garnick recovers $75,000.00. That's what I will do, because you have found her to be 50% at fault. The amount that she will recover is $75,000.00 Is there anyone—how do I ask the question? (Pause.)

Is anyone surprised by what I have just told you?

(Several jurors responded by nods.)

JUROR [W.][Foreperson]: Yes.

THE COURT: Mrs. [W.], do you feel that you can speak for the entire Jury?

JUROR [W.]: Yes.

THE COURT: Is there someone that doesn't think Mrs. [W.] can speak for them? (No response.)

You are surprised by the result, Mrs. [W.]?

JUROR [W.]: Yes.

THE COURT: What do you want me to do now counsel?

MR. WILLIAMS: Give the verdict form back to the Jury and let them—I would like to confer with Counsel before we—

MR MEYER: They may need additional instruction, your Honor, to know the effect of the verdict. (Pause.)

THE COURT: Sit down, Gentlemen.

This is not the first time this has happened to me, folks, okay?

Its [sic] instruction No. 20, which provides in pertinent part: It will be necessary for you to determine the percentage

of fault, if any, of each of the persons involved in the occurrence. It also will be necessary for you to determine the amount of damages sustained by any party claiming damages. Your findings as to fault will affect the Plaintiff's recovery. It is my duty to explain how that may occur. The Defendant's liability for damages is limited by the percentage of fault, if any, that you find is attributable to the Defendant. The recovery for Plaintiff is reduced by the percentage of fault, if any, that you find attributable to the Plaintiff Jessica Garnick. Should you determine that Plaintiff Jessica Garnick's fault exceeds 50%, the Plaintiff will not be entitled to recover any damages. (Pause.)

The verdict, please, Mrs. Hawkins. (Pause.)

With respect to damages, the verdict provides in Question 4: Without considering the percentage of fault attributed as above, what total amount of damage—damages do you find was sustained by Plaintiff Jessica Garnick? Note, the Judge will make appropriate deductions for fault attributable to the Plaintiff Jessica Garnick, if any.

Now, I do not know for certain what your intent is. I do not want to know what your intent is. But I—and I want no discussion from you. I want no indication from any of you what your intent is, but I will give you my interpretation.

My interpretation is that you wanted Jessica Garnick to have $150,000.00. I have no way of knowing whether I am right or whether I am wrong, but I—that's what I think. And I believe that I must send you back, after having read these instructions and after having told you to consider all of the other instructions as well as the ones that I have read to you; and if you believe that your verdict needs to be corrected, then you shall correct it. If you do not believe that it should be corrected, you should not correct it.

Now, I tell you those things because I recently had a jury in Uinta County where the verdict form was not correct. When I talked to the jury about what they meant to do in the jury verdict, they told me. Both parties knew what the Jury wanted done. There was a raging blizzard outside, so I sent the Jury home without sending them back to correct the verdict form and guess what? I'm going through a new trial because I didn't send the jury back to correct the verdict. And when I didn't do that, both sides said "I won. I don't care what the Jury told you in open court, Judge. My side of the case won. I'm going to appeal." So I said, "Well, if that's what you're going to do, we're going to have a new trial." And the Supreme Court said, "Judge Troughton, you're right. Give them a new trial."

So I think I have to send you back so that you can discuss among yourselves whether or not you think the verdict is a correct verdict, whether it expresses your intent or whether it doesn't; and to make whatever changes you think are necessary to the verdict.

Mr. Williams, do you have any objection to that?

MR. WILLIAMS: No, your Honor.

THE COURT: Mr. Copenhaver?

MR. COPENHAVER: No, your Honor.

THE COURT: Now, with the parties' permission, I will tell the Jury that the simple thing for them to do is just to change the number in the last question. Is that all right with you, Mr. Williams?

MR. WILLIAMS: Yes, sir.

THE COURT: How about it for you, Mr. Copenhaver?

MR. COPENHAVER: If that's their intent, that's fine, your Honor.

THE COURT: Yes, because if that's not what you wanted her to have—if you wanted her to have $150,000, then you need to change that figure to $300,000. That's the simple solution. But you do what you believe is the appropriate thing to do. I am not instructing you to do anything because it's your decision; and it's something that you folks have to resolve because you're the judges of this, not me. All I can do is to try to make sure you understand things. I don't want any of you to think that I'm telling you what to do because I'm not. The last thing in the world that I

want to do in this case is to do that to you folks. Because if I do that, I'm going to get an appeal. And I don't want an appeal in this case. I want it to be over.

All right. Mr. Colter, will you take the Instructions and the Jury Verdict and have the Jury retire. We'll stand by, folks.

[¶ 24] The jury then returned to continue its deliberations at 12:27 a.m. on November 10, 1999, and returned seven minutes later with its revised verdict. As shown above, the verdict was changed from $150,000.00 to $250,000.00. The Court did ask the jury foreperson if that was correct, and the response was "Yes." The trial court said it would not further poll the jury. It then asked counsel for both parties if there was anything further, and both said "No." The jury was then excused. A few minutes later, with the jury gone and after the trial court explained to counsel and Jessica Garnick herself that it would not have found Garnick to be 50% at fault and that he would have awarded her more money if it was up to him, counsel for Garnick lodged two objections to the verdict. The first was based on a theory that the jury still did not get the amount of damages right, *i.e.*, it appeared to want her to have $150,000, but only changed its verdict to award $125,000. The second was to the effect that the trial court should have further polled the jury. The trial court's position was that both of those issues should have been raised before the jury was excused.

[¶ 25] Garnick contends that this scenario clearly demonstrates profound confusion on the part of the jury, that the jury did not take enough time to seriously reflect on its modified verdict, and that the trial court should have allowed further polling of the jury. Taking into account all circumstances shown by the record, including the fact that Garnick failed to object to the trial court's decision not to further poll the jury or to specifically ask for such polling when the trial court gave the opportunity for such a request, we will not conclude that the trial court abused its discretion in denying the motion for new trial.

## Failure to Fully and Properly Instruct the Jury

[¶ 26] Garnick contends that the trial court erred in refusing several jury instructions she offered. The function of jury instructions is to give the jury guidance with respect to the applicable law. A trial court is not obligated to give an offered instruction, so long as the jury is adequately instructed on the law as it pertains to the case at hand. We do not reverse a trial court's rulings on an instruction unless it is demonstrated that the instruction was necessary to impart to the jury the proper principles of law that are applicable to the case and, further, that the proponent of the refused instruction can show prejudice. *Ormsby*, 997 P.2d 465 at 471; *Reese v. Board of Directors of Memorial Hospital of Laramie County*, 955 P.2d 425, 427 (Wyo.1998).

[¶ 27] Garnick first contends that the trial court erred in refusing to give the following premises liability instruction:

Teton County School District No. 1 must use ordinary care to keep the obstacle course in a reasonably safe condition for the purpose for which it was reasonably intended.

In connection with that duty, the school district also has the affirmative duty to protect students against dangers known to exist by it and also to protect against dangers which it should discover by the use of reasonable care.

It is contended that the instruction is loosely based on our holding in *Rhoades v. K–Mart Corporation*, 863 P.2d 626, 629 (Wyo.1993), as well as W.P.J.I.C. 9.03 (1994), which provides:

A landlord must use ordinary care to keep the [stairs, hallways, walks, and so forth] in a reasonably safe condition for the purpose for which the [stairs, hallways, walks and so forth] were reasonably intended.

[¶ 28] Without reciting all of the instructions given, suffice it to say we are persuaded that the message intended to be conveyed to the jury, by that proposed instruction, was adequately conveyed to the jury by other instructions. It is also abun-

dantly clear that Garnick was permitted wide latitude in arguing her point to the jury that the School was negligent with respect to the set-up and use of the obstacle course. In addition, this case was not really postured as a premises liability case, although an instruction like that offered might well have been given without prejudice to the School. Finally, we do not see that Garnick was prejudiced by the failure of the trial court to give the instruction.

[¶ 29] Next, Garnick contends that the trial court erred in failing to give its "theory of the case" instruction:

> The plaintiff in this case is Jessica Garnick. The defendant in this case is Teton County School District No. 1. Jessica Garnick claims as follows:

> The "railing to mat" jump located in the obstacle course was dangerous and the school district employees should not have permitted its use. The railing was too high to jump from, the mat was too small to adequately protect obstacle course participants and the obstacle course instructions were inadequate.

[¶ 30] For this proposition, Garnick relies on *Bigley v. Craven,* 769 P.2d 892, 894–98 (Wyo.1989) (citing *Short v. Spring Creek Ranch, Inc.,* 731 P.2d 1195, 1199–1200 (Wyo.1987)); *also see Langdon v. Baldwin–Lima–Hamilton Corporation,* 494 P.2d 537, 541 (Wyo.1972). It is true those cases require that a trial court give a theory of the case instruction but only if it is also a clear declaration of the law. An instruction that is not consistent with law should be refused. *Short,* 731 P.2d at 1200. The offered instruction is not a statement of the law that would govern the facts in this case but a statement of the facts that tend to support Garnick's legal theory. In argument to the jury, Garnick was permitted full rein in this regard. However, the authority cited does not require a trial court to give the jury an instruction that summarizes a party's factual contentions. We find no error in the refusal of the offered instruction.

[¶ 31] Garnick also contends that the trial court erred in failing to give a concurrent cause instruction:

> There may be more than one cause of injury, that is, there may be concurrent causes.

> Concurrent causes do not always occur simultaneously. One cause may be continuous in operation and joined with another cause at a later time.

[¶ 32] The offered instruction is an accurate recitation of W.P.J.I.C. 3.05 (1994), but we do not consider the instruction to have been necessary or appropriate under the circumstances of this case. Concurrent cause, of necessity, requires the actions of at least a third party, or force, (although there may be a fourth, a fifth, *etc.*). 3 Stuart M. Speiser, Charles F. Krause, Alfred Gans, *The American Law of Torts,* § 11.5 (1986); *Natural Gas Processing Company v. Hull,* 886 P.2d 1181, 1186–87 (Wyo.1994). Here, the proposed instruction does not appear to relate to the theories presented to the jury which were that the School was negligent (Garnick's theory) and that Garnick was negligent (the School's theory). The instruction would have served no purpose under the circumstances of this case, and there was no error in the trial court refusing it.

## Collective or Cumulative Error

[¶ 33] Finally, Garnick contends that the errors discussed above, when viewed cumulatively, require a new trial. As is so often the case with cumulative error arguments, they are dependent on this Court agreeing that any error existed. In this instance, the furthest we are able to go is that the trial court's asserted error in the admission of evidence obtained by the jury during its visit would have at most been harmless error. In all other respects, we find no error. That problems were encountered in this case cannot be denied, but all of the problems were capable of resolution short of a mistrial or a new trial. Trials are required to be fair, but they need not be perfect.

### CASE NO. 00–214

[¶ 34] The School contends that the district court erred in its award of costs. At the conclusion of the trial, the district court awarded Garnick a total of $11,442.11 in costs. The School contends that this amount

should be reduced to $6,075.14. Garnick concedes that the award of costs should be reduced to $8,425.21. Thus, our resolution of these issues need only deal with the middle ground between those two figures.

[¶ 35] Costs are governed by statute and court rules. *Snyder v. Lovercheck,* 992 P.2d 1079, 1091 (Wyo.1999); *Hashimoto v. Marathon Pipe Line Company,* 767 P.2d 158, 167–69 (Wyo.1989); *Weaver v. Mitchell,* 715 P.2d 1361, 1372 (Wyo.1986); *Bi–Rite Package, Inc. v. District Court of the Ninth Judicial District of Fremont County,* 735 P.2d 709, 712 (Wyo.1987). Within the confines set out above, the determination of allowable costs to be taxed is within the discretion of the trial court. *Hashimoto,* 767 P.2d at 168–69; *State v. Dieringer,* 708 P.2d 1, 11–13 (Wyo.1985).

[¶ 36] An expert witness "shall be allowed witness fees of twenty-five dollars ($25.00) per day or such other amount as the court allows according to the circumstances of the case." Wyo. Stat. Ann. § 1–14–102(b) (LexisNexis 2001). For purposes of costs in this case, the district court was authorized to "award and tax costs and apportion them between the parties on the same or adverse sides as it deems right and equitable." Wyo. Stat. Ann. § 1–14–126(a) (LexisNexis 2001); *also see* W.R.C.P. 54(d) and U.R.D.C. 501(a).[13]

13. (a) Civil Cases.

(1) Filing of Certificate of Costs. Within 20 days after entry of the final judgment allowing costs to the prevailing party, a certificate of costs shall be filed and copy served upon opposing counsel. The certificate shall be itemized. For witness fees, the certificate shall contain:

(A) The name of the witness;

(B) Place of residence, or the place where subpoenaed, or the place to which the witness voluntarily traveled without a subpoena to attend;

(C) The number of full days or half days the witness actually testified in court;

(D) The number of days or half days the witness traveled to and from the place of trial;

(E) The exact number of miles traveled;

(F) The manner of travel, air, railroad, bus or private vehicle; and,

(G) If common carrier transportation is used, the price of an economy fare.

(2) Objections to Certificate of Costs. If no objections are served within 10 days after service of the certificate of costs, the costs shall be taxed as set forth in the certificate of costs. If objections are filed, the court shall consider the objections and tax costs. A hearing may be provided at the discretion of the court.

(3) Allowable Costs.

(A) Filing Fees, jury demand fees, and fees for services of process. (W.S. § 18–3–608 sets forth sheriff fees.)

(B) Witness Fees.

(i) Witness fees are allowed at the rate of $30.00 per day and $15.00 per half day necessarily spent traveling to and from the proceeding and in attendance at the proceeding. Mileage is allowed at the rate of $.23 per mile, not to exceed the costs of common carrier transportation rates.

(ii) Expert witness fees shall be allowed at the rate of $25.00 per day or such other amount as the court may allow according to the circumstances of the case. If the amount allowed constitutes a higher hourly rate than $25.00 per day, this higher amount is allowable only for the time that the expert witness actually testified. Time charged in preparation for providing testimony and/or standing by awaiting the call to give testimony is not allowable as costs, except at the rate of $25.00 per day.

(C) Reporter Fees. The $45.00 fee is a taxable cost. Transcripts of proceedings, such as motion hearings, pretrial conferences, etc., prepared at the request of a party in anticipation of trial are not taxable as costs unless such matters become part of the record on appeal.

(D) Costs of Depositions.

(i) Costs of depositions are taxable if reasonably necessary for the preparation of the case for trial. A deposition is deemed reasonably necessary if:

I. Read to the jury as provided in Rule 32(a)(3), W.R.C.P.;

II. Used at trial for impeachment concerning a material line of testimony (impeachment on a collateral issue does not fall within the scope of this rule);

III. Necessarily, and not merely conveniently, used to refresh the recollection of a witness while on the stand; or

IV. Was taken at the request of a nonprevailing party. The foregoing are meant to provide guidelines, and are not exhaustive. The use of depositions for trial preparation alone does not justify the imposition of costs.

(ii) Reporters fees for depositions. Actual, ordinary reporting fees will be allowed. Extra costs for expediting transcripts or daily copy costs will not be allowed, except as authorized by an order entered prior to the date such costs are to be incurred. Reporters' travel, per diem expenses and appearance fees will not be taxed as costs.

(iii) Fees and expenses of counsel. Fees and expenses of counsel for traveling to and attending depositions are not taxable as costs.

(E) Copies of Papers. Duplicating costs necessarily incurred for documents admitted

[¶ 37] We will not analyze the School's argument in detail because the School has failed to support its contentions with cogent argument or pertinent authority. Moreover, the School's arguments are not written with the applicable standard of review in mind. In addition, such an analysis would not, in any way, further advance our jurisprudence with respect to costs in a case such as this. We accept Garnick's concession that costs should be reduced to the amount of $8,425.21 because expert witness fees awarded were excessive in that they should not have been paid for out of court preparation time.

## CONCLUSION

[¶ 38] The judgment of the district court is affirmed. The order awarding costs is affirmed as modified above. The case is remanded to the district court for the purpose of entering an order reducing the award of costs to $8,425.21.

LEHMAN, C.J., filed a dissenting opinion.

LEHMAN, Chief Justice, dissenting.

[¶ 39] I respectfully dissent. My apprehension in this case evolves from the purported confusion of the jury regarding the amount of damages awarded to appellant. The majority correctly points out that both parties agreed to the procedure used by the court and, beyond that, I acknowledge that appellee did not raise it as an issue. It was raised, however, in a different context by plaintiff and is of such fundamental import that I must give comment.

[¶ 40] The jury, after determining the comparative fault of the parties, first returned with a verdict of $150,000. Those damages were written in by the jury in a blank under the paragraph which read:

> Without considering the percentage of fault attributed as above, what total amount of damages do you find was sustained by Plaintiff Jessica Garnick (Note, the Judge will make appropriate deductions for fault attributable to the plaintiff, Jessica Garnick, if any)

[¶ 41] When compared to instructions courts provide to jurors involving complex legal theories, that language seems relatively straight forward. The jury asked no questions during its deliberations, and, when initially polled, the jurors acknowledged that the $150,000 was in fact its verdict. What followed, however, was further inquiry about the jurors' intent, with the ultimate explanation by the court that if the jury *wanted* the plaintiff to get $150,000, it would have to award her $300,000. The only reason this issue was presented to the court at all was the jury came back with a $250,000 verdict rather than the $300,000, and the plaintiff thought that proved confusion on the part of the jury.

[¶ 42] My problem, of course, is that the jury first determined the total amount of damages it felt plaintiff had suffered. That is what the law requires; that is what the jurors were instructed to find. The jurors performed their difficult task, and the only remaining duty of the court was to apply the law of contributory negligence based upon the percentage of fault determined by the jury. What appears to have occurred, however, is that the increased damage amount from $150,000 to $250,000 was determined by the jury, not based upon what the actual damages it felt occurred to the plaintiff, but what amount the jurors *wanted* the plaintiff to receive.

---

into evidence shall be allowed. Duplication costs for documents for counsel's own use are not allowable.

(F) Exhibits Received in Evidence. The expense of preparing exhibits received in evidence, including 8 by 11 photographs (but not enlargements), videotapes, models and other demonstrative evidence are allowable as taxable costs at the discretion of the court.

(4) Other Costs Not Enumerated.—These rules do not preclude the award of other costs not enumerated herein if otherwise allowable under law; nor do they require the award of costs as they may be denied altogether if the court, through the exercise of its discretion, so determines. Moreover, to the extent that W.S. § 1–14–125 limits costs, that statute is controlling. However, costs associated with the offer of judgment rule, i.e. Rule 68, W.R.C.P., must be awarded.

(5) Apportionment.—All costs may be apportioned among some or all of the non-prevailing parties as the court may determine.

[¶ 43] In fact the colloquy from the court as it was reinstructing the jury regarding damages included language about what the jury *wanted* the plaintiff to have. Quoting from a portion of the discussion:

THE COURT: Yes, because if that's not what you wanted her to have—if you wanted her to have $150,000, then you need to change that figure to $300,000. That's the simple solution. But you do what you believe is the appropriate thing to do.

[¶ 44] The question is not what the jury, the court, or counsel want the plaintiff to receive. The question is not how to avoid application of comparative fault statutes. The question is what damages were incurred by the plaintiff. The above instruction given by the court is not in accordance with law. The error of law committed is, I believe, so fundamental and clearly resulted in a different verdict, that it cannot be ignored. I would reverse for a new trial in which a jury would be allowed to determine once again the percentage of fault attributed to the parties and, without influence, the total amount of damages it felt was actually suffered by plaintiff.