Dorothy ORMSBY, Appellant (Plaintiff),

v.

DANA KEPNER CO. OF WYO. INC., a
Wyoming Corporation, Appellee
(Defendant).

No. 97–83.

Supreme Court of Wyoming.

Feb. 23, 2000.

Rehearing Denied March 16, 2000.

Representing Appellant: John R. Hursh and Donald J. Rissler of Central Wyoming Law Associates, P.C., Riverton, Wyoming.

Representing Appellee: Jerry N. Jones of Moye, Giles, O'Keefe, Vermeire & Gorrell, Denver, Colorado; and Frank D. Neville and Scott E. Ortiz of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Before LEHMAN, C.J., and THOMAS, MACY, GOLDEN, and TAYLOR,* JJ.

THOMAS, Justice.

The dispositive issue in this case arises out of the jury instructions given by the trial court to assist the jury in making its determination as to whether the Employee Benefit Handbook (Handbook) adopted by Dana Kepner Company of Wyoming, Inc. (Dana Kepner) constituted an offer of job security that had been accepted by Dorothy Ormsby (Ormsby). Collateral issues are asserted with respect to whether the Handbook created an implied-in-fact contract of employment, as a matter of law, and the failure to remove a challenged juror for cause. We hold that the jury instructions erroneously stated the applicable law, and the case must be reversed and remanded for a new trial. We do not perceive the Handbook as creating an employment contract as a matter of law, and the question of the existence of a contract must be resolved by the trier of fact. We do not address the claim of error relating to the challenge of the juror for cause because it is not likely to arise at the new trial.

In the Opening Brief of Appellant, submitted on behalf of Ormsby, the issues that are raised are:

### ISSUE I

Did the district court err when it failed to find an implied-in-fact contract in this case as a matter of law?

### ISSUE II

Did the district court err when the court failed to instruct the jury on what constitutes consideration in an employment contract case and on what elements the jury must find, in deciding whether the handbook in this case constituted an implied-in-fact contract?

### ISSUE III

Did the district court err when the court failed to remove an admittedly biased juror under W.S. 1–11–203(vi) and (vii), thereby forcing appellant to waste one of her peremptory challenges, which resulted in the improper seating of a juror who ended up as foreman?

This statement of the issues is found in the Appellee's Answer Brief, filed on behalf of Dana Kepner:

Appellant's "Statement of Issues on Appeal" purports to set forth three issues for this Court's consideration. Two of those issues, the second and third, are not articulated in an objective manner. Appellee Dana Kepner Co. of Wyoming, Inc. ("Dana Kepner") submits that those issues should be stated more objectively as follows:

II. Did the trial court fail to properly instruct the jury on the elements of a breach of employment contract claim based on an employee handbook?

III. Did the trial court commit reversible error in denying Ormsby's challenge for cause of one of the prospective jurors?

In the Reply Brief of Appellant, these rebuttal issues are stated:

I. There were sufficient facts in the record to support Appellant['>]s theory of the case[.]

II. A part[y's] contention instruction is insufficient to instruct a jury on the law of consideration as an element of a contract.

III. The Court's refusal to strike Hollister was plain error.

IV. Response to this Court's Order striking portions of [her] brief and amendment of opening brief.

Dana Kepner is in the business of supplying construction material for water and sewer projects. It is a subsidiary of a corpora-

---

*Chief Justice at time of oral argument; retired    November 2, 1998.

tion that is based in Denver, Colorado, and it had an office in Casper. About May 15, 1991, Ormsby was hired as a temporary employee in Dana Kepner's Casper office through Ormsby's employer, Kelly Services. Ormsby was hired to work as a part-time administrative assistant, with responsibilities for answering the telephone, filing paperwork, checking items out of inventory, typing, and other general clerical tasks. About three months later, Ormsby left her job with Kelly Services, and became a full-time employee at Dana Kepner. Dana Kepner promptly enrolled her in the company's health care plan, and it waived any probationary period of employment.

In 1989, Dana Kepner had adopted the Handbook, which was in effect during Ormsby's period of employment with Dana Kepner. Ormsby saw a copy of the Handbook when she was hired full-time in August of 1991, but she did not receive a copy of her own until October 7, 1991. At that time, Ormsby signed an "Acknowledgment," which afforded to Dana Kepner the right to change anything in the Handbook and assured Ormsby that any changes would be communicated to her. Of significance to this case are the provisions relating to employee classifications, adjustment of employee complaints, and discipline. Those provisions of the Handbook read as follows:

IV.   EMPLOYEE CLASSIFICATIONS

Each employee will initially be assigned to one of the classifications shown, to be changed as the employee's status or duties change.

A.   Temporary Employee:

An employee hired on a temporary part-time or full-time basis, at a fixed hourly wage, not eligible for any company benefits unless otherwise specifically arranged during the hiring process.

B.   Permanent Employee:

An employee hired on a permanent full-time or part-time basis, under one of the following sub-classifications:

1.   Hourly Employee:

An employee paid on an hourly basis.

2.   Regular Employee:

An employee paid on a monthly basis.

3.   Sales Employee:

An employee doing outside sales work full time and paid on a monthly basis.

4.   Branch Manager:

An employee managing one of our branches, and paid on a monthly basis.

5.   Executive Employee:

An employee hired for executive work, and who is an officer of the company, to be paid on an annual basis, payably monthly.

6.   Other:

The company may create additional classifications as necessary.

Each employee will be given an annual review by his supervisor, at which time the employee will be encouraged to discuss any problems or complaints he may have. His overall performance will be evaluated and discussed, and at that time any desired changes in classification or benefits will be made.

Permanent, Hourly and Regular Employees will be reviewed in the month of their anniversary date and any changes will be retroactive to the first of that month.

Sales Employees, Branch Managers and Executive Employees will be reviewed during the first calendar quarter of the year, regardless of anniversary date.

* * *

XXXIX.   ADJUSTMENT OF EMPLOYEE COMPLAINTS

Two-way communication between the company and its employees is essential for maintaining a harmonious working relationship. This is especially true in connection with employee complaints or disputes.

If you believe that you are being treated unjustly according to accepted standards of a sound management-employee relationship, or you feel that the policies set forth in these guidelines are not being properly or fairly applied, you are encouraged to use the following procedures to get your complaint aired and adjusted.

1. You should first discuss the matter thoroughly with your supervisor who will be required to give you a complete answer promptly.

2. If you are not satisfied with your supervisor's response, you may appeal to the President for review.

It is both our intent and policy to encourage employees to bring their differences, or disputes, to us. You are assured that no employee will be retaliated against in any manner because the employee has sought to fairly adjust a complaint.

## XL. DISCIPLINE

Disciplinary action is occasionally necessary in any organization. It would be unfair not to let you know where the company stands on the matter of maintaining discipline.

Naturally, there are certain rules and regulations contained in this book and others will be issued from time to time, so that we know what is expected in our relationships with one another and toward our customers.

Some things cannot be condoned.

1. Theft
2. Willful destruction of property
3. Fighting
4. Using non-prescribed narcotics
5. Being intoxicated on the job
6. Sleeping on the job
7. Gross misconduct
8. Gross negligence
9. Harassment of other employees

These are things that can result in immediate suspension or discharge.

In addition, there will be an occasional employee who will fall into poor personal or work habits. Counseling by the supervisor usually will be enough, but if counseling fails, appropriate action will be taken to resolve the problem.

Smoking by employees in the desk and file areas is strictly prohibited. Anyone wishing to smoke in the building may do so in designated areas.

Please note that "Smoke Breaks" are not provided. It is our intention that all employees are treated equally and fairly.

In April of 1992, Dana Kepner adopted a centralized computer system. Ormsby went to the Denver office and received training on the use of the computer system. When she returned to Casper, she was given the sole responsibility for performing tasks on the computer concerning customer orders and the preparation of invoices to facilitate payment for those orders. The computer system permitted Dana Kepner to generate customer invoices daily. At trial, Dana Kepner introduced evidence to establish cause for Ormsby's discharge. Its evidence was designed to demonstrate its claim that, beginning in early 1992, it had various problems with Ormsby's work performance. Testimony was received that Ormsby continually was late in running customer invoices; Ormsby had a poor attitude and was subject to sudden outbursts of temper; Ormsby did not follow proper filing and paperwork procedures; Ormsby did not respond well to constructive criticism; Ormsby did not answer the telephone properly; Ormsby had been rude to customers and even the company President on one occasion; and Ormsby was not able to get along with one of the other three employees at the Casper office. In September of 1992, when Ormsby returned from a week of vacation, the branch manager told her, in private, that she was being discharged. The manager advised Ormsby that the reasons for her termination were that she was behind on her work, had been rude to customers, and the company President was not happy with the delays in invoicing.

For her part, Ormsby refuted many of these accusations, and she asserted, instead, that her termination was attributable to the fact that she reported the improper behavior of a co-worker. Ormsby had suspected that the salesperson was drinking too much; was not in the office as much as he should be; and he was not returning customer phone calls. She reported this to the branch manager who did not take any action. In July of 1992, the Vice President in charge of sales for Dana Kepner visited the Casper office. Ormsby approached the Vice President and

asked if she could speak to him about a fellow employee without jeopardizing her job. The Vice President responded that Ormsby should feel safe in talking to him, and Ormsby then related her concerns about the Casper salesperson. She did that again later that day when the Vice President took Ormsby and her husband to dinner. Ormsby asserts that her concerns were related to the branch manager who, to protect the salesperson, fired her in September of 1992. Ormsby assumes that this termination was in violation of the promise by the Vice President that there would not be any retaliation.

In August of 1994, Ormsby brought this action against Dana Kepner, claiming that her employment contract had been terminated in violation of its terms. At the close of Ormsby's case, Dana Kepner moved for judgment as a matter of law and for partial judgment as a matter of law on the issue of damages, both pursuant to W.R.C.P. 50. The trial court denied these motions in part and granted them in part. By agreement of the parties, Ormsby dismissed her claims for wrongful discharge and promissory estoppel with prejudice. Her other two claims, breach of an implied contract and breach of the implied covenant of good faith and fair dealing, went to the jury.

■ Following presentation of all of the evidence, the jury was instructed by the trial court, and, after closing arguments, the jury entered into its deliberations. The jury returned a verdict for Dana Kepner on both of the remaining claims. Specifically, the jury found that there was no implied contract between Ormsby and Dana Kepner and that Dana Kepner had not breached the implied covenant of good faith and fair dealing. Ormsby submitted a post-trial motion for a new trial, which was denied, and then appealed from the judgment entered on the jury's verdict. In addition to her claim of error in the jury instructions, Ormsby argues that the Handbook resulted in an implied contract as a matter of law. She also argues error in the sitting of one of the jurors. We hold that the question of whether the Handbook resulted in an implied contract of employment is one of fact not law because of its ambiguity, and we do not decide the issue relating to the juror. We reverse the judgment entered on the jury verdict because of incorrect jury instructions.

Recently, we summarized our employment contract law in *Boone v. Frontier Refining Inc.*, 987 P.2d 681, 685 (Wyo.1999):

In Wyoming, employment relationships are presumed to be at-will. *Davis v. Wyoming Medical Center, Inc.*, 934 P.2d 1246, 1249 (Wyo.1997); *Loghry v. Unicover Corporation*, 878 P.2d 510, 512 (Wyo.1994). In an at-will employment relationship, either the employer or the employee may terminate the relationship at any time, for any reason or for no reason at all. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 217 (Wyo.1994). The at-will presumption may be rebutted by a showing that the parties entered into an express or implied agreement which prohibited the employer from discharging the employee without just cause. *Brodie v. General Chemical Corporation*, 934 P.2d 1263, 1265 (Wyo.1997); *Davis*, 934 P.2d at 1249. Express contracts and implied contracts for continued employment are equally enforceable. *Wilder*, 868 P.2d at 217. An express contract for continued employment exists when the terms of the agreement are declared by the parties in writing or verbally. 868 P.2d at 216. An implied contract for continued employment is created by "a mutual agreement and intent to promise which is found in the acts or conduct of the party sought to be bound." *Id.* Employment contracts which are set out in employee handbooks or policies are implied contracts. 868 P.2d at 217.

■ Many of the cases involving claims of an implied employment contract arising out of an employee's handbook have involved a summary judgment entered in the district court. In this instance, no summary judgment was sought by Ormsby so the trial court was not afforded that opportunity to construe or interpret the Handbook. Normally, the construction and interpretation of an unambiguous contract is a matter for the court to address as a question of law. *Garcia v. UniWyo Federal Credit Union*, 920 P.2d 642, 645 (Wyo.1996); *Feather v. State*

*Farm Fire and Cas.*, 872 P.2d 1177, 1180 (Wyo.1994); *Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 707 (Wyo.1985). Since the trial court, in this instance, submitted to the jury the question of whether the Handbook resulted in an implied contract promising Ormsby that she would be terminated only for cause, we assume the trial court concluded that the Handbook was ambiguous. Ormsby contends that the trial court specifically was requested to rule on the question of ambiguity, and it failed to make such a ruling.

Our examination of the Handbook at issue does not persuade this Court that as a matter of law the Handbook resulted in an implied contract providing for discharge only for cause. We hold that there was no error in submitting to the jury the issues relating to construction and interpretation of the Handbook. In connection with the jury instructions, however, prejudicial error did occur.

In the course of its instructions to the jury, the trial court gave the following instructions:

### INSTRUCTION NO. 8

For a contract to be binding, three things must occur: first, the offer; second, the acceptance; and third, the consideration.

It is necessary that there be a mutual assent to the essential terms and conditions of the subject about which the parties are agreeing. One party cannot make an agreement; both parties must, by their words or actions, assent to the agreement.

A contract may be made in any manner sufficient to show agreement. It may be oral or written or implied from the conduct of the parties.

### INSTRUCTION NO. 10

For a promise to be legally enforceable something of value must be bargained for and given in exchange for the promise; this is called consideration.

Consideration may be defined as: a promise—such as a promise to pay money or to perform services or deliver goods, or

an act—such as the payment of money, the delivery of goods, or the performance of services or a forbearance—such as a forbearance to act, to compete, to sue, or to promise.

### INSTRUCTION NO. 19

A statement in an employee handbook that an employee is a "permanent" employee does not alter the at-will status of the employee unless the employee supplied consideration in addition to working for the employer or there is explicit language in the employee handbook stating that termination may be only for cause.

The thrust of these several jury instructions was to tell the jury to identify a bilateral contract requiring that Ormsby furnish some additional consideration beyond that of continuing to work for Dana Kepner.

The suggestion of the necessity for a bilateral contract is erroneous. We have stated clearly that an implied contract of employment is a unilateral contract which does not involve mutuality of obligation between the parties. *Brodie v. General Chemical Corp.*, 934 P.2d 1263, 1265 (Wyo.1997); *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 217 (Wyo.1994). Indeed, we have created a special contractual category for implied contracts of employment. They serve to overcome the presumption of an at-will employment. *Wilder*, 868 P.2d at 218; *Leithead v. American Colloid Co.*, 721 P.2d 1059, 1062–63 (Wyo.1986).

Contrary to Instruction Nos. 8 and 10, given by the trial court, we said in *Brodie*, 934 P.2d at 1266:

Under unilateral contract principles, we have determined that an employee's continued employment is acceptance of and consideration for the new rights offered by the contract modification. The consideration which flows to the employer is the orderly, cooperative and loyal workforce which the employer hoped its promise would evoke. *Id.* [*Mobil Coal Producing, Inc. v. Parks*, 704 P.2d 702, 706–07 (Wyo. 1985)]. Other courts have similarly acknowledged that because the most likely motive for an employer to make a promise

of employment security to the workforce in general is that the promise will encourage employees to continue their employment, it is logical to view continued employment as acceptance of, and consideration for, such promise. 1 [Henry H.] Perritt, [Jr., *Employee Dismissal Law and Practice* ] *supra*, § 4.37 [ (3d ed1992) ].

■ Our cases teach that we recognize a contract in every employment situation. Even employment at-will rests upon a unilateral contract in which the employer offers employment and the employee accepts by performing the work. Either party can dissolve the relationship at any time; the employer by choosing not to offer the work or the employee choosing not to perform it. We have expanded upon this basic relationship by recognizing a special implied bilateral contract formed by the utilization of an employee handbook, in which the employer is deemed to have offered a job for a particular term or one from which the employee can be discharged only for cause. The consideration received by the employer for the additional rights afforded the employee is the benefit of an " 'orderly, cooperative and loyal workforce.' " *Mobil Coal Producing, Inc.*, 704 P.2d at 707 (*quoting Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880, 892 (1980)). *Brodie*, 934 P.2d at 1266 reaffirms this proposition. Instruction No. 19, given by the trial court, is contrary to these well-established principles of employment law, particularly with respect to the statement that a statement in a handbook "does not alter the at-will status of the employee *unless the employee supplied consideration in addition to working for the employer* * * * ." (Emphasis added.)

■ We have summarized our rule with respect to review of jury instructions for reversible error in *L.U. Sheep Co. v. Board of County Com'rs of County of Hot Springs*, 790 P.2d 663, 672 (Wyo.1990):

In considering the validity of instructions to a jury, we must determine whether the instructions, taken as a whole, adequately advise the jury of the applicable law. *Banks v. Crowner*, 694 P.2d 101 (Wyo. 1985). Proper instructions should be clear declarations of the pertinent law. *Short v. Spring Creek Ranch, Inc.*, 731 P.2d 1195 (Wyo.1987). The ruling of a trial court on an instruction will not constitute reversible error unless there is a showing of prejudice, which connotes a demonstration by the complaining party that the instruction misled or confused the jury with respect to the applicable principles of law. *DeJulio v. Foster*, 715 P.2d 182 (Wyo.1986).

To the same effect are *Turcq v. Shanahan*, 950 P.2d 47, 51 (Wyo.1997) and *Thunder Hawk By and Through Jensen v. Union Pacific R. Co.*, 891 P.2d 773, 782–83 (Wyo. 1995). We are satisfied that Ormsby did suffer prejudice because of the erroneous jury instructions, and the case must be reversed and remanded for a new trial.

■ We are confident that in the new trial and in future cases involving similar issues, counsel and the trial court will be able to agree upon appropriate jury instructions that explain to the jury the presumption of an at-will employment relationship and that the presumption is rebuttable by a showing of a modification through an express or implied contract. The jury should be advised that an employee handbook may constitute an implied contract if it manifests an intention to create an expectation that employment will not be terminated except for cause or will be for a specified term. The jury also should be told that in arriving at the determination as to the existence of an employment contract, the handbook, personnel policies, letters of employment, performance evaluations, and a course of dealing may supply the terms for an implied-in-fact employment contract which, in the absence of an adequate disclaimer, requires termination for cause. The jury should be advised in accordance with *Brodie*, 934 P.2d at 1266 and *Mobil Coal Producing, Inc.*, 704 P.2d at 707 that the consideration received by the employer for any additional rights afforded to the employee is the benefit of an " 'orderly, cooperative and loyal workforce.' " The jury also needs to be told that, if it finds an offer for job security, acceptance by the employee occurs by the performance of or the continuation of employment, which also affords appropriate consideration for the new rights attaching to the job security.

With respect to the claim of error arising out of the jury selection process, we do not address that issue. We do not perceive that it is likely to arise upon a retrial of this case, and we simply afford a caveat to district courts that judges should be wary of rehabilitating a prospective juror who has vehemently articulated bias or prejudice with respect to a party or an issue.

The judgment entered on the jury verdict in this case is reversed, and the case is remanded for a new trial in accordance with this opinion.