DAVIS, Chief Justice.
*312 [¶ 1] This appeal involves Lucy Lietz's nearly nine year effort to challenge her termination by the Wyoming Department of Family Services (DFS). DFS dismissed Ms. Lietz from her position as a fraud investigator when it discovered that she signed daycare logs for her grandchildren that resulted in overpayment of DFS child care benefits to daycare providers in the amount of $196.95. Ms. Lietz appealed, and the Office of Administrative Hearings (OAH) reversed. DFS appealed, and the district court found that the OAH erred as a matter of law because it failed to apply the Life Care Centers of America, Inc. v. Dexter , 2003 WY 38, 65 P.3d 385 (Wyo. 2003), good faith standard in evaluating whether DFS had cause to terminate Ms. Lietz's employment. On remand, the OAH again found in favor of Ms. Lietz. DFS appealed, and the district court again reversed, finding that the OAH had improperly substituted its judgment for that of DFS. Ms. Lietz timely appeals from the district court's determination. We reverse the district court and reinstate the OAH decision.
ISSUE
[¶ 2] Both parties present several issues, which we consolidate into the following issue and sub-issues:
Was the OAH's determination that DFS lacked good cause for dismissing Ms. Lietz supported by substantial evidence and in accordance with the law?
A. Does the good faith standard require notice and an opportunity to be heard beyond that which is contained in the employment contract?
B. What is the role of the fact-finder in evaluating cause under the good faith standard?
C. Was the OAH's determination that DFS lacked good cause for dismissing Ms. Lietz supported by substantial evidence?
FACTS
[¶ 3] Lucy Lietz, a fraud investigator, worked for DFS for just short of 25 years when it terminated her employment. The series of events that led to her termination began in May of 2010, when Ms. Lietz learned that her pregnant daughter was drunk and was driving with her three children from Fort Collins, Colorado, toward Casper. Ms. Lietz called in a REDDI report, and knowing that her daughter would be arrested, headed south on I-25 from Casper so that she could meet up with law enforcement and take her grandchildren if necessary. As she anticipated, her daughter was arrested, and Ms. Lietz began caring for her three grandchildren that night. The children were 9 years, 6 years, and 18 months old at the time.
[¶ 4] Ms. Lietz immediately sought daycare for the children. Because daycare for a child under the age of two is expensive, she applied for daycare benefits through DFS. In addition, because one of the children had a hereditary illness that required daily medication, Ms. Lietz applied for Medicaid benefits. Ms. Lietz was also eligible for benefits under the POWER program, which pays cash directly to family members who care for children who would otherwise go to foster care. Ms. Lietz testified that she did not apply for POWER benefits because she did not need the money to pay for the children's daily needs. That program would have paid Ms. Lietz approximately $550 per month during the time she had the children, for a total of over $3,000.
[¶ 5] In late 2010, DFS received a "complaint" asking how Megan Juarez's (Ms. Lietz's daughter) children could be receiving public assistance when she did not have the children with her. Michelle Rossetti, Ms. Lietz's supervisor, was assigned to investigate. Ms. Rossetti set out to determine whether the children (and Ms. Lietz) were eligible for benefits. Ms. Lietz was eligible for benefits, including financial assistance for her grandchildren's daycare during the time *313 she was working or engaged in an otherwise approved activity.[1]
[¶ 6] However, during her investigation, Ms. Rossetti discovered that "there were days in which Ms. Lietz was not in an approved activity and yet DFS had paid for daycare." On eight days between June and October, Ms. Lietz was not engaged in an approved activity (she had taken personal, sick or vacation leave on those days rather than working) and therefore she was not eligible for DFS assistance. Nevertheless, she signed daycare time logs approving DFS payment for daycare on those days, which resulted in an overpayment of benefits actually due by DFS to the daycare providers of $196.95. Ms. Rossetti concluded her investigation without speaking with Ms. Lietz. Based upon her findings, on January 4, 2011, DFS placed Ms. Lietz on administrative leave, and on January 21, 2011, notified Ms. Lietz of its intent to dismiss her from her employment because she engaged in "an act of intent to fraud the Child Care Program."
[¶ 7] Ms. Lietz immediately repaid the $196.95 overpayment and responded to the DFS intent-to-dismiss letter. In her response, Ms. Lietz admitted that she made a mistake when she signed the daycare logs without reviewing them, she explained that she signed the logs without thinking because she was under a lot of pressure caring for all three children and with her daughter in jail, but "vehemently disagree[d]" with DFS's allegations of fraud and theft. On February 10, 2011, DFS dismissed Ms. Lietz.
[¶ 8] Ms. Lietz requested a hearing before the OAH, and the OAH hearing examiner reversed the dismissal. The State appealed that decision, and the district court reversed, directing the OAH to apply the good faith standard set forth in Life Care Centers of America, Inc. v. Dexter , 2003 WY 38, 65 P.3d 385 (Wyo. 2003). On remand, the OAH again found in favor of Ms. Lietz. The State appealed, and the district court again reversed, finding that the OAH erred as a matter of law when it concluded that DFS failed to follow procedural requirements and because it substituted its own discretion for that of DFS. The district court also found that DFS met the Life Care good faith standard. Ms. Lietz timely appealed.
STANDARD OF REVIEW
[¶ 9] The Wyoming Administrative Procedure Act establishes the scope of this Court's review:
(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
(i) Compel agency action unlawfully withheld or unreasonably delayed; and
(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
(B) Contrary to constitutional right, power, privilege or immunity;
(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
(D) Without observance of procedure required by law; or
(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.
Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2017).
[¶ 10] When we consider an appeal from a district court's review of an administrative agency's decision, we are not bound by the conclusions of the district court.
*314 Reynolds v. West Park Hosp. Dist., 2010 WY 69, ¶ 6, 231 P.3d 1275, 1277 (Wyo. 2010) ; Guier v. Teton Cty. Hosp. Dist. , 2011 WY 31, ¶¶ 12-13, 248 P.3d 623, 629-30 (Wyo. 2011). We consider the case "as if it came to us directly from the agency." State ex rel. Wyoming Workers' Comp. Div. v. Brewbaker , 972 P.2d 962, 964 (Wyo. 1999). We defer to the agency's findings of fact, and we affirm those findings if they are supported by substantial evidence. Dale v. S & S Builders, LLC, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008) ; Dep't of Revenue & Taxation of State of Wyo. v. Casper Legion Baseball Club, Inc., 767 P.2d 608 (Wyo. 1989).
[¶ 11] When we review a claim that an agency determination is not "supported by substantial evidence, we determine if there is 'such relevant evidence as reasonable minds would accept as adequate to support a conclusion.' " Employment Sec. Comm'n of Wyoming v. W. Gas Processors, Ltd. , 786 P.2d 866, 870-71 (Wyo. 1990) (quoting Southwest Wyoming Rehab. Ctr. v. Emp. Sec. Comm'n of Wyo. , 781 P.2d 918, 921 (Wyo. 1989) ). "Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings." Coggins v. State ex rel. Dept. of Workforce Serv., Workers' Comp. Div. , 2018 WY 77, ¶ 10, 421 P.3d 555, 559 (Wyo. 2018) (internal citations and quotation marks omitted). We "review an agency's conclusions of law de novo, and '[w]e will affirm an agency's legal conclusion only if it is in accordance with the law.' " Guier , ¶ 13, 248 P.3d at 630 (quoting DC Prod. Serv. v. Wyo. Dep't of Employment, 2002 WY 142, ¶ 7, 54 P.3d 768, 771 (Wyo. 2002) ).
DISCUSSION
I. Was the OAH's determination that DFS lacked good cause for dismissing Ms. Lietz supported by substantial evidence and in accordance with the law?
[¶ 12] We begin our analysis with the employment contract. In Wyoming, employment is presumed to be at-will. Ormsby v. Dana Kepner Co. of Wyo., Inc. , 997 P.2d 465, 469, 471 (Wyo. 2000) ("Even employment at-will rests upon a unilateral contract in which the employer offers employment and the employee accepts by performing the work."). However, the "at-will presumption may be rebutted by a showing that the parties entered into an express or implied agreement which prohibited the employer from discharging the employee without just cause." Boone v. Frontier Refining, Inc. , 987 P.2d 681, 685 (Wyo. 1999).
[¶ 13] In the private employment context, an express or implied agreement between the employer and employee may provide the terms of the employment contract. Ormsby , 997 P.2d at 471 ("we recognize a contract in every employment situation"). We frequently examine language of employee handbooks to determine the terms of the employment contract and whether they provide that an employee may be discharged only for cause. See, e.g., Ormsby , 997 P.2d at 471 ; Brodie v. Gen. Chem. Corp. , 934 P.2d 1263, 1266 (Wyo. 1997) ; Mobil Coal Producing, Inc. v. Parks , 704 P.2d 702, 707 (Wyo. 1985). In the public employment context, personnel rules often form the terms of the employment contract. See Abell v. Dewey , 870 P.2d 363, 369-71 (Wyo. 1994). We have also recognized that specific statutes or departmental personnel manuals may set forth terms of a public employment contract. See, e.g. , Hoff v. City of Casper-Natrona Cty. Health Dep't , 2001 WY 97, ¶ 16, 33 P.3d 99, 103 (Wyo. 2001) (health department personnel manual and separate disclaimer formed employment contract); Seyfang v. Bd. of Trustees, Washakie Cty. Sch. Dist. No. 1 , 563 P.2d 1376, 1381 (Wyo. 1977) (legislature created property interest in continued employment for tenured teachers).
[¶ 14] Here, DFS agrees that the employment contract in this case consists of the State Personnel Rules. The relevant rules provide:
Section 1. Reasons for Discipline.
....
(b) An agency head may discipline a permanent employee for cause including, but not limited to the following reasons:
(i) Absenteeism;
(ii) Incapacity to perform assigned duties;
(iii) Assault;
*315 (iv) Carelessness;
(v) Damaging State property;
(vi) Dishonesty;
(vii) Insubordination;
(viii) Misconduct;
(ix) Refusal to work;
(x) Sexual harassment;
(xi) Theft;
(xii) Unsatisfactory work performance;
(xiii) Criminal conduct;
(xiv) Falsification of application for employment;
(xv) Violation of agency rules or policy;
(xvi) Violation of the State Personnel Rules[.]
State of Wyoming Personnel Rules, ch. 11, § 1(b) (2009).[2] The rules also establish a system of progressive discipline for permanent employees:
Section 2. Determination of Appropriate Discipline .
(a) Agency heads shall, except in cases of flagrant behavior , attempt to administer discipline to permanent employees in progressive stages so as to seek corrective results. In determining appropriate disciplinary action, the agency head should consider the following factors:
(i) Nature and extent of infraction;
(ii) Employee's past record; and
(iii) Effect on the operation of the agency.
(b) The agency head's determination of the appropriate action to be taken shall be based on an investigation of the facts and circumstances of the case. Progressive stages of discipline may include corrective action including but not limited to, letters of expectation, letters of counseling, or verbal or written warnings. However, the taking of such corrective action is not mandatory and an agency head may within his/her sole discretion determine to administer discipline as called for in Section 3 herein as an initial step of discipline to a permanent employee.
Personnel Rules, ch. 11 § 2 (emphasis added). Section 3 provides:
(i) Dismissal of Permanent Employees. If previous disciplinary action has not served to achieve corrective results, or if the nature and extent of the employee's behavior is such that other disciplinary action is not appropriate, the agency head may dismiss a permanent employee.
Personnel Rules, ch. 11, § 3(d)(i) (emphasis added). Thus, the employment contract in this case allowed DFS to discipline permanent employees for cause, it requires progressive discipline, except in cases of "flagrant behavior," and it gave the head of DFS the discretion to dismiss a permanent employee like Ms. Lietz without discipline "if the nature and extent of the employee's behavior is such that other disciplinary action is not appropriate."
[¶ 15] The Personnel Rules also establish the role of the OAH in reviewing personnel actions. The OAH must:
(iii) determine if the agency complied with relevant procedural requirements of the personnel rules of the executive branch of the state of Wyoming;
(iv) determine, based upon the evidence presented at hearing, whether the agency established facts by a preponderance of the evidence constituting good cause for the personnel action, in which event the action shall be affirmed, or whether the facts established by the agency do not constitute good cause for the personnel action, in which event the action shall be reversed; and
(v) recommend alternative management action.
Personnel Rules, ch. 12, § 7(g) (2010); see also Wyo. Stat. Ann. § 9-2-1019(a)(iii) (LexisNexis 2017). Accordingly, when it reviews personnel actions, the OAH must inquire whether the agency had good cause for the personnel action. The burden rests with the *316 agency to establish good cause by a preponderance of the evidence.
[¶ 16] In Life Care Centers of America, Inc. v. Dexter , 2003 WY 38, 65 P.3d 385 (Wyo. 2003), we set forth the framework for evaluating cause in the employment context. Life Care terminated Ms. Dexter's employment as the activities director at its nursing center in Sheridan and Ms. Dexter claimed that Life Care breached their employment contract. Id. ¶¶ 1, 4, 65 P.3d at 388-39. The terms of their employment contract required progressive discipline, but provided for the possibility of "immediate discharge" if Life Care "lose[s] confidence in [the employee's] ability to perform [their job] adequately." Id. ¶ 11, 65 P.3d at 391-92. The trial court found that Life Care failed to follow its progressive discipline procedures, but it did not make a finding on whether Life Care complied with the contract terms under the lost-confidence provision of the policy. Id. ¶¶ 10, 12, 65 P.3d at 391-92. We remanded, directing the trial court to make a factual finding as to "whether, under the terms of the handbook, Life Care had cause to terminate Ms. Dexter's employment without following the progressive discipline procedures." Id. ¶ 12, 65 P.3d at 392.
[¶ 17] We instructed the trial court to consider the terms of the handbook in light of the evidence presented by Life Care regarding its concerns about Ms. Dexter's performance and in light of the evidence presented by Ms. Dexter "to support her claims that the reasons given for her discharge were pretextual." Id. ¶¶ 13-14, 65 P.3d at 392. In addition, we adopted the good faith standard for determining cause in employment termination decisions. Id. ¶ 15, 65 P.3d at 392. We explained that
[u]nder this standard, the question to be resolved by the fact finder is not, " 'Did the employee in fact commit the act leading to dismissal?' " Cotran [v. Rollins Hudig Hall Int'l, Inc. , 17 Cal.4th 93], 69 Cal.Rptr.2d 900, 948 P.2d [412] , 421-22 [ (1998) ] ; see also Almada [v. Allstate Ins. Co., Inc. ], 153 F.Supp.2d [1108], 1114 [ (D. Ariz. 2000), aff'd , 285 F.3d 798 (9th Cir. 2002) ]. Rather, it is, " 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?' " Id ."Cause" is defined under this standard as
fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond.
Life Care , ¶ 15, 65 P.3d at 392 (quoting Cotran , 69 Cal.Rptr.2d 900, 948 P.2d at 422 ).[3]
*317 However, "[r]ecognizing that there may be circumstances where notice and an opportunity to respond are not practicable," we modified the standard, holding that "notice and an opportunity to respond must be shown in implied employment contract cases only when the express terms of the implied contract so provide." Life Care , ¶ 15, 65 P.3d at 393.
[¶ 18] In DFS's appeal from the OAH's original decision, the district court found that the OAH failed to apply the Life Care standard and remanded. On remand, the OAH considered Life Care and made findings regarding the adequacy of the investigation and the existence of good cause under the good faith standard.
[¶ 19] The OAH first concluded that, contrary to the requirements set forth in the Personnel Rules, ch. 11, § 2, and Life Care , the investigation in this instance was inadequate:
59. There is no question that, in the eyes of the [DFS], they engaged in an appropriate investigation of the facts and circumstances of the case. The [DFS's] witnesses testified at length as to the investigation and the documentary review conducted in this matter. However, the [DFS] did not conduct an adequate investigation. The facts clearly established the [DFS] did not provide Lietz notice of the claimed misconduct or provide her the opportunity to explain her position until after the Notice of Intent to Dismiss had been issued. Without notice and opportunity, there cannot be an adequate investigation.
(Emphasis in original.)
[¶ 20] The OAH next found that the DFS decision to terminate Ms. Lietz was not supported by good cause as defined by Life Care . It recognized that its task was to inquire whether "the factual basis on which [DFS] concluded a dischargeable act had been committed [was] reached honestly, after an appropriate investigation and for reasons that [were] not arbitrary or pretextual." That is, did the DFS have " 'fair and honest reasons, regulated by good faith on the part of [DFS], that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual' and [was DFS's conclusion] 'reasoned' and 'supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond[?]' " (citing Life Care , 65 P.3d at 392-93 ). The OAH concluded:
64. Applying the standard in Life Care , the evidence did not establish the [DFS's] decision to terminate Lietz was reached honestly, after an appropriate investigation, and for reasons not arbitrary or pretextual. For a conclusion to be reasonable, it must be supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond . The facts in this case clearly established Lietz was not notified of the claimed misconduct and not given a chance to respond until after the Notice of Intent to Dismiss had been issued. Since Lietz was not put on notice and not given an opportunity to respond, there was not an adequate investigation, and this appears to make the decision to terminate arbitrary or pretextual. After a one-sided investigation, the [DFS] determined Lietz's violation of the Child Care Program Rules and Policy constituted flagrant dishonesty, insubordination, misconduct, theft, unsatisfactory work performance, violation of agency rules, violation of Personnel rules, and violation of the Code of Ethics. The [DFS's] witnesses concluded Lietz's conduct was intentional and that she deliberately attempted to defraud the State and receive benefits for which she was not entitled. It is difficult to understand how these conclusions could reasonably be made without obtaining Lietz's input.
65. There is no question that Lietz signed a series of day care provider logs claiming day care benefits for which she *318 was not entitled on eight days in a four-month period. There is also no question that Lietz was not working on the days she received those benefits. The [DFS's] witnesses all concluded this was evidence of intentional fraud. This Hearing Examiner disagrees. Lietz was a credible witness and clearly explained she was under a lot of stress, signed the day care logs without properly reviewing them, and that she received benefits for which she was not entitled. It does not make sense to believe a 25-year employee who routinely applies the rules and knows the consequences of violating the rules intentionally violated the rules and attempted to obtain payment of $196.95 for which she was not entitled. Lietz made a series of mistakes by signing the day care logs for the months of June through September 2010, admitted this fact, and paid the amount in question. Lietz was eligible for a caretaker stipend of approximately $500.00 per month for taking care of her grandchildren instead of the State paying for foster care. Lietz was aware this money was available, but she chose not to take advantage of the program. If Lietz wanted to obtain money from the State, she would have taken advantage of that program.
66. This Hearing Examiner finds and concludes the evidence presented established Lietz made a series of mistakes over a four-month period, which does not equate to a reasonable good faith conclusion to terminate Lietz's employment. At most, Lietz is guilty of violating agency policy and procedures by obtaining benefits for which she was not entitled.
....
68. The [DFS's] decision to dismiss Lietz is rescinded. While the [DFS] complied with the Personnel Rules' procedural requirement that a decision to discharge be based on an investigation of the facts and circumstances, it was not an adequate investigation. The evidence did not establish the [DFS's] decision to terminate Lietz was reached honestly, after an appropriate investigation, and for reasons not arbitrary or pretextual. For a conclusion to be reasonable it must be supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond . The facts in this case clearly established Lietz was not notified of the claimed misconduct and not given a chance to respond until after the Notice of Intent to Dismiss had been issued. Since Lietz was not put on notice and not given an opportunity to respond, there was not an adequate investigation, and this appears to make the decision to terminate arbitrary or pretextual.
(Emphasis added.)
[¶ 21] Ms. Lietz argues that the OAH's decision was supported by substantial evidence and complies with the law. DFS asserts three arguments in response: (1) The OAH misapplied the good faith standard when it determined that DFS did not provide Ms. Lietz adequate notice; (2) the OAH's application of Life Care's good faith standard was contrary to law because the OAH substituted its own judgment for DFS managerial discretion; and (3) the conclusion that DFS lacked good cause to terminate Ms. Leitz's employment is not supported by substantial evidence. We address each of these arguments below.
A. Does the good faith standard require notice and an opportunity to be heard beyond that which is contained in the employment contract?
[¶ 22] DFS first argues that Life Care 's definition of cause does not include notice and opportunity to be heard, and as a result, the OAH misapplied the law when it examined the notice provided to Ms. Lietz and when it concluded that Ms. Lietz was entitled to notice prior to the issuance of the notice of intent to dismiss letter. DFS also contends that it provided all the notice that was required by the personnel rules (the contract in this case).
[¶ 23] The personnel rules provide that "[p]rior to the dismissal of a permanent employee, the agency head shall provide to the employee written notification specifying ... the reason(s) and summary of the evidence for the dismissal" and that the employee be given ten days in which to respond to *319 the charges in writing. Personnel Rules, Ch. 11, § 3(d)(i)(A). DFS claims that it complied with this rule when it provided Ms. Lietz with the intent-to-dismiss letter and gave her ten days to respond. We agree with DFS that it complied with that rule.[4]
[¶ 24] However, the OAH's focus was on the adequacy of DFS's investigation in terms of its fairness as compelled by the Life Care standard, not its compliance with the personnel rule establishing the notice and response process required to dismiss a permanent employee. The OAH was bothered by the fact that the investigation was "one-sided" and that Ms. Lietz "was not notified of the claimed misconduct and not given a chance to respond until after the Notice of Intent to Dismiss had been issued [and DFS had decided to terminate her employment]." The OAH concluded that this fact "appears to make the decision to terminate arbitrary or pretextual" and expressed its difficulty in understanding how the conclusion that Ms. Lietz intentionally defrauded the State "could reasonably be made without obtaining Ms. Lietz's input."
[¶ 25] Cotran v. Rollins Hudig Hall Intern., Inc. , 17 Cal.4th 93, 69 Cal.Rptr.2d 900, 948 P.2d 412 (1998), the leading case adopting the good faith standard and the case relied upon by this Court in Life Care when it adopted the good faith standard in Wyoming, held that to have "good cause" to terminate employment, the employer's decision must be "supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." Id., 69 Cal.Rptr.2d 900, 948 P.2d at 422 (emphasis added). This Court used the same language in its definition of "cause" in Life Care . Life Care , ¶ 15, 65 P.3d at 392. The Cotran court explained that "it would be imprudent to specify in detail the essentials of an adequate investigation" but nevertheless stated that "investigative fairness in this context contemplates" that the employer " 'act in good faith and fairly listen to both sides, for that is a duty lying upon every one who decides anything.' " Cotran , 69 Cal.Rptr.2d 900, 948 P.2d at 422 (quoting Bd. of Ed. v. Rice , App. Cas. 179, 182 (1911) ). In Life Care , we recognized that "there may be circumstances where notice and an opportunity to respond are not practicable" and adopted a "slight variation" to the notice requirement, holding that "notice and an opportunity to respond must be shown in implied employment contract cases only when the express terms of the implied contract so provide." Life Care , ¶ 15, 65 P.3d at 393. However, nowhere in Life Care did we state that its investigation does not have to be adequate for an employer to comply with the good faith standard.
[¶ 26] This is not a case where notice and opportunity were impracticable, and as explained above, notice and opportunity were required by the express terms of the employment contract. The OAH's analysis centered on the adequacy of the investigation and the reasonableness of DFS's conclusions based upon its one-sided investigation, not on compliance with the notice provisions in the contract. Such an analysis is appropriate in an evaluation of cause under the good faith standard which incorporates "investigative fairness," and "fairly listen[ing] to both sides." Cotran , 69 Cal.Rptr.2d 900, 948 P.2d at 422. It was also appropriate under the terms of the employment contract which require the agency head to determine "the appropriate action to be taken ... based on an investigation of the facts and circumstances of the case." Personnel Rules, ch. 11 § 2(b).
[¶ 27] Nevertheless, we conclude that to the extent the OAH determined that notice and opportunity to be heard beyond what was mandated by the terms of the contract were required, the OAH misapplied the notice requirement established in Life Care .
*320 This, however, does not end our inquiry. The issue before the Court is whether there was sufficient evidence to support the OAH's conclusion that DFS lacked cause to terminate Ms. Lietz's employment. Accordingly, we address DFS's next argument, that the OAH exceeded its role by substituting its judgment for that of the DFS.
B. What is the role of the fact-finder in evaluating cause under the good faith standard?
[¶ 28] DFS contends that the OAH's application of Life Care's good faith standard was contrary to law because the OAH substituted its own judgment for DFS managerial discretion, which, DFS claims is improper because it "stifle[s] effective management."
[¶ 29] Life Care specifies "the question to be resolved by the fact finder is not, 'Did the employee in fact commit the act leading to the dismissal?' " Life Care , ¶ 15, 65 P.3d at 392 (emphasis in original). "Rather, it is, 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?' " Id. DFS claims that the OAH misapplied this standard because the OAH did not believe Ms. Lietz's conduct was intentional. DFS argues that in making that conclusion, the OAH failed to ask the question required by Life Care - whether DFS arrived at its conclusion that a dischargeable act had occurred in good faith.
[¶ 30] As the Cotran court recognized, evaluating both whether an employee committed the act leading to dismissal (the standard rejected in Life Care ) and whether the factual basis the employer relied upon to conclude a dischargeable act had been committed was reached honestly, after an appropriate investigation and for reasons that are not arbitrary, trivial or pretextual (the standard adopted in Life Care ), require the fact-finder to conduct a factual inquiry. Cotran , 69 Cal.Rptr.2d 900, 948 P.2d at 422. The difference is that in "the first, the [fact-finder] decides the ultimate truth of the employee's alleged misconduct" and in "the second, it focuses on the employer's response to allegations of misconduct." Id . Regardless, in applying the good faith standard, "the [fact-finder's] role is to assess the objective reasonableness of the employer's factual determination of misconduct." Id. , 69 Cal.Rptr.2d 900, 948 P.2d at 419 (emphasis in original).
[¶ 31] Recently, the Idaho Supreme Court considered the role of the fact-finder in employment disputes where the good faith standard for determining cause applied. Lunneborg v. My Fun Life , 421 P.3d 187, 195 (Id. 2018). As DFS argues in this case, the appellants there "advocate[d] that trial courts must give deference to the decisions of the employer in disputes involving termination for cause, arguing that the trial court erred by substituting its judgment for that of the employer." Id. The appellants asserted that
"courts are not authorized to second guess an employer" and that "[e]mployers in Idaho must feel confident ... that if they conduct a reasonable investigation concerning the conduct of their employees and find cause to terminate, an Idaho court will not simply second guess that decision and substitute its own judgment as some 'super personnel committee.' "
Id. (emphasis in original) (footnote omitted). The Idaho Supreme Court responded that this "position misstates the role of the fact-finder in these types of cases." Id . It concluded that the fact-finder's duty is to "require ... that good cause be rooted in an objectively reasonable basis for the termination, based on facts supported by substantial evidence." Id.
[¶ 32] In Lunneborg , the trial court "found that good cause did not exist ... because neither of the two reasons given in the termination letter was true, and neither of those reasons was supported by the evidence." Lunneborg , 421 P.3d at 196 (emphasis in original). The trial court also found that even if the employer "believed in the truth of those reasons, such belief was not reasonable." Id . The Idaho Supreme Court held that the trial court "applied the appropriate objective standard" and its findings were proper because "[s]uch findings are the absolute essence of a trier of fact's purview...." Id . We agree with the Idaho court.
*321 [¶ 33] Our review of the OAH's findings indicates that the OAH properly applied the Life Care standard and its findings were within its province. The OAH's responsibility was to determine whether DFS established by a preponderance of the evidence that it had cause to dismiss Ms. Lietz. Personnel Rules, ch. 12, § 7(g)(iv); see also Wyo. Stat. Ann. § 9-2-1019(a)(iii) ; Life Care , ¶ 15, 65 P.3d at 392. To perform this task, the OAH was required to evaluate whether DFS reached its conclusion fairly, honestly, and in good faith; in other words, it had to assess the objective reasonableness of DFS's determinations. See Life Care , ¶ 15, 65 P.3d at 392 ; Cotran , 69 Cal.Rptr.2d 900, 948 P.2d at 419 ; see also Southwest Gas Corp. v. Vargas , 111 Nev. 1064, 901 P.2d 693, 700 (Nev. 1995) (applying the good faith standard and explaining that "[g]enuine issues of material fact casting a strong doubt on the purported good-faith of the employer are ripe for a jury's consideration").
[¶ 34] There was no dispute regarding the truth of Ms. Lietz's alleged misconduct: Ms. Lietz received benefits to which she was not entitled and there is no question she violated agency policy and procedures by signing erroneous daycare time sheets. The OAH necessarily took those facts into account in its evaluation of the objective reasonableness of DFS's response to her conduct. The OAH was, however, entitled to make other relevant factual findings pertaining to its inquiry. The OAH properly examined the facts leading to Ms. Lietz's termination, including DFS's investigation of her conduct, the conclusions it reached, the reasonableness of those conclusions, and Ms. Lietz's circumstances. In evaluating the reasonableness of DFS's conclusion that Ms. Lietz committed a dischargeable act, the OAH determined that because Ms. Lietz had the ability to obtain much more money from the State through the POWER program than she had received due to the improper daycare time records, it was not reasonable for the DFS to conclude that she intended to defraud DFS.
[¶ 35] The OAH did not apply the wrong standard when it reached the conclusion that DFS lacked cause to terminate Ms. Lietz, nor did it substitute its judgment for that of the DFS. The OAH's responsibility was to determine whether DFS complied with Life Care's good faith standard when it determined it had cause to terminate Ms. Lietz's employment. The OAH did that when it examined the facts, found that it was not reasonable for the DFS to conclude that Ms. Lietz intended to defraud the DFS, and consequently, found that DFS did not have a "reasonable good faith" basis to terminate Lietz's employment.
C. Was the OAH's determination that DFS lacked good cause for dismissing Ms. Lietz supported by substantial evidence?
[¶ 36] Before the OAH, DFS carried the burden of establishing cause by a preponderance of the evidence. Personnel Rules, ch. 12, § 7(g)(iv). The OAH concluded that DFS failed to meet that burden. DFS argues that the OAH's conclusion was not supported by substantial evidence and that it had good cause, as defined by Life Care , because it believed Ms. Lietz, who was a fraud investigator, had defrauded it. Our review of the record reveals that the OAH's finding that DFS lacked cause to terminate Ms. Lietz's employment under the Life Care standard was supported by substantial evidence.
[¶ 37] As discussed in the previous section, the OAH found that DFS's conclusion that Ms. Lietz intentionally defrauded the State was unreasonable and not made in good faith. That finding is supported by the following evidence:
• Ms. Lietz was a 25-year employee of DFS who consistently met or exceeded expectations in her performance reviews.
• Ms. Lietz, who was caring for her grandchildren during their mother's incarceration, was entitled to and availed herself of DFS child care benefits.
• Ms. Lietz could have legally obtained POWER benefits of approximately $550 per month during the time she was caring for her grandchildren.
• Ms. Lietz knew that she qualified for POWER benefits but testified she did not apply for them because "it wasn't about the money.... I didn't want *322 them to actually pay me money to take care of my grandchildren."
• Ms. Lietz signed daycare logs that were submitted by daycare providers to DFS for payment. Those logs contained entries for eight days over a 3-month period on which Ms. Lietz was not engaged in an approved activity. She was accordingly not entitled to receive DFS payment of child care on those days.
• Ms. Lietz's error led to a $196.95 overpayment in benefits by the DFS to the child care providers.
• Ms. Lietz testified that she made mistakes in signing the daycare logs, but that she did not do so intentionally.
• Ms. Lietz was under a great deal of stress and pressure caring for her three grandchildren and dealing with her pregnant, alcoholic daughter who was in jail.
• When she discovered she had been overpaid, Ms. Lietz immediately paid the $196.95 back to DFS.
[¶ 38] Based upon this evidence, the OAH concluded that "[i]f Lietz wanted to obtain money from the State, she would have taken advantage of [the POWER] program," that "the evidence presented established Lietz made a series of mistakes over a four-month period," and that the evidence "does not equate to a reasonable good faith conclusion [that there was cause] to terminate Lietz's employment." This evidence is relevant evidence that "reasonable minds would accept as adequate to support" the OAH's conclusion that Ms. Lietz did not intend to defraud the State. See Coggins , ¶ 10, 421 P.3d at 559. Accordingly, we conclude that the OAH's decision is supported by substantial evidence.
[¶ 39] DFS also argues that it had the discretion to terminate Ms. Lietz's employment under the terms of the personnel rules that allow immediate discharge in cases of flagrant behavior at the "sole discretion" of an agency head.[5] See Personnel Rules, ch. 11 §§ 2, 3. DFS's conclusion that Ms. Lietz intended to defraud the State formed the basis for its conclusion that she could be terminated without progressive discipline, as required by the Personnel Rules absent "flagrant" behavior. See Personnel Rules, ch. 11, § 2(a). However, once the OAH determined that the conclusion that Ms. Lietz intended to defraud the State was not a reasonable one, the foundation for this argument crumbled.
[¶ 40] The Personnel Rules charge the OAH with the responsibility of reviewing personnel actions and specifically determining whether a preponderance of the evidence supports a finding of cause. Personnel Rules, ch. 12, § 7(g)(iv). Accordingly, the OAH had the responsibility to analyze whether DFS's conclusion that Lietz's behavior was "flagrant" was a reasonable one and thus justified a failure to apply progressive discipline procedures. Personnel Rules, ch. 12, § 7(g)(iv). It follows from the OAH's conclusion that it was unreasonable for DFS to conclude that Ms. Lietz acted with an intent to defraud, that Ms. Lietz's conduct could not reasonably be considered "flagrant," and DFS should have applied progressive discipline instead of terminating Ms. Lietz's employment.
CONCLUSION
[¶ 41] The OAH's decision was supported by substantial evidence and complies with the law. While the OAH properly examined the adequacy of the investigation, it misapplied the good faith standard to the extent that it determined that DFS did not provide *323 Ms. Lietz with the notice to which she was entitled under the terms of her employment contract. The OAH's application of Life Care's good faith standard was appropriate and its conclusion that DFS lacked good cause to terminate Ms. Lietz's employment was supported by substantial evidence. We reverse the district court and reinstate the OAH decision.

DFS guidelines explain that the caregiver requesting benefits must "be participating in an approved activity in order to receive child care" benefits and define "approved activities" as "employment or self-employment" and several other activities that are not relevant to the facts here. DFS Child Care, SNAP & POWER Policy Manual § 701.

The rules referenced in this opinion were in effect at the time of Ms. Leitz's disciplinary action.

In Life Care we did not provide a rationale for adopting the good faith standard. Other courts adopting the rule view employment contracts as fundamentally different than other contracts and conclude that due to "practical considerations of running a business" the employer, and not the fact-finding court or jury, should "retain the fact-finding prerogative underlying the decision to terminate employment." Towson University v. Conte , 384 Md. 68, 862 A.2d 941, 953 (2004). While neither party has asked this Court to reconsider the Life Care standard, we note that other jurisdictions quite reasonably apply a different rule. See, e.g. , Kern v. Palmer College of Chiropractic , 757 N.W.2d 651 (Iowa 2008) ; Toussaint v. Blue Cross & Blue Shield of Michigan , 408 Mich. 579, 292 N.W.2d 880 (1980). Those courts view employment contracts as "not so different from other contracts as to justify a legal construct favoring the employer's interests over those of employees." Kern , 757 N.W.2d at 660. They reject the good faith standard because it transforms good-cause contracts into satisfaction contracts, giving the employer the ability to discharge an employee if it is in good faith dissatisfied with the employee's performance, regardless of whether cause exists. As the Toussaint court explained, "[w]here the employee has secured a promise not to be discharged except for cause, he has contracted for more than the employer's promise to act in good faith or not to be unreasonable." Toussaint , 292 N.W.2d at 896. The Toussaint court "viewed policy statements providing for some measure of job security as analogous to deferred compensation such as termination pay, death benefits, and profit-sharing benefits." William Holloway & Michael Leech, Employment Termination: Rights and Remedies 42 (2nd ed. 1993); see Toussaint , 292 N.W.2d at 894. "A promise of job security to induce employee trust and services, it reasoned, is not so different from a promise of deferred compensation that one would be enforceable and the other unenforceable." Holloway & Leach, supra , at 42. Those courts also rightly observe that employers are not required to enter into for-cause contracts and they can contract for specific job performance standards if they are concerned that a for-cause clause alone would not provide flexibility. Toussaint , 292 N.W.2d at 896-97 ; Kern , 757 N.W.2d at 660.

An additional overlay of notice and opportunity to be heard applies in public employment cases. As we recently summarized, prior to termination of their employment, due process requires that "[p]ublic employees ... be given notice sufficient to afford them a reasonable opportunity to know the claims of the opposing parties and meet them." Sweetwater Cty. Sch. Dist. No. 1 v. Goetz , 2017 WY 91, ¶ 37, 399 P.3d 1231, 1238 (Wyo. 2017) (quoting Davis v. City of Cheyenne , 2004 WY 43, ¶ 17, 88 P.3d 481, 488 (Wyo. 2004) ) (all dealing with Cleveland Bd. of Ed. v. Loudermill , 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ). Neither party addressed due process issues in their briefing, and we likewise decline to address the issue here.

We recognize that the personnel rules give some discretion to agency heads; however, the language allowing agency heads to dismiss permanent employees without discipline in limited situations does not convert what would otherwise be for-cause employment to at-will status. Such decisions must be made fairly and reasonably. In other words, an agency head may not terminate employment for no reason or for invalid reasons under the guise of acting in his or her "sole discretion." If the legislature had wanted to convert employment to at-will status, it would not have required cause for discharge or would have provided a valid disclaimer in the statutes or the personnel rules. See Brock v. State ex rel. Wyoming Workforce Services, Unemployment Ins. Div. , 2017 WY 47, ¶ 13 n.6, 394 P.3d 460, 465 n.6 (Wyo. 2017) (noting that if the legislature intended liens at issue in that case to have priority, it could have easily done so). Instead, the statutes and the personnel rules require cause and contain no disclaimer.